UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| THOMAS ALLOTEY, et al. | * | |
| *Plaintiffs* | * | |
| v. | * | Civil No. 1:21-CV-2288-JMC |
| BALTIMORE COUNTY,<br>MARYLAND, et al. | * | |
| | * | |
| *Defendants* | | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants, by and through their undersigned counsel, submit this Memorandum in support of their Motion for Summary Judgment.

## TABLE OF CONTENTS

INTRODUCTION ............................................................................. 2

UNDISPUTED FACTS ...................................................................... 3

STANDARD OF REVIEW ................................................................. 7

SUMMARY OF ARGUMENT ............................................................ 8

ARGUMENT .................................................................................... 9

   I.  BECAUSE OFFICER BECKETTS HAD REASONABLE SUSPICION THAT A CRIME WAS BEING COMMITTED, HIS ENTRY INTO THE RESIDENCE WAS LAWFUL. ................... 9

  II.  BECAUSE THERE WAS REASONABLE SUSPICION THAT A CRIME WAS BEING COMMITTED, DETENTION OF PLAINTIFFS WAS LAWFUL. ...................................... 14

 III. BECAUSE DEFENDANTS HAD PROBABLE CAUSE TO ARREST PLAINTIFF ALLOTEY, HIS ARREST WAS LAWFUL. .................................... 19

 IV. USE OF FORCE TO ARREST PLAINTIFF ALLOTEY WAS REASONABLE. .................... 23

V.  BECAUSE THERE WAS PROBABLE CAUSE TO BELIEVE PLAINTIFF ALLOTEY HAD COMMITTED A CRIME, DEFENDANTS ARE ENTITLED TO JUDGMENT ON COUNTS II AND VI. ..................................................................................................... 29

VI.  DEFENDANTS HAVE QUALIFIED IMMUNITY TO ALL FEDERAL CLAIMS. ................ 30

VII. BECAUSE DEFENDANTS WERE LEGALLY ENTITLED TO DETAIN PLAINTIFFS AND DID NOT USE EXCESSIVE FORCE, DEFENDANTS ARE ENTITLED TO JUDGMENT ON THE STATE COMMON LAW TORTS. ....................................................................... 32

CONCLUSION ................................................................................................................ 34

## INTRODUCTION

Plaintiffs bring various federal and Maryland claims based on an encounter between them and several Baltimore County Police officers, who came to Plaintiffs' residence in response to a suspected burglary call. Plaintiffs allege violation of constitutional rights and state common law torts based on the officers' conduct in investigating the suspected crime and placing Plaintiff Allotey in handcuffs and charging him with several crimes. Specifically, the Complaint alleges excessive force under the Fourteenth Amendment and Articles 24 and 26 of the Maryland Declaration of Rights (Counts I and V); malicious prosecution under the Fourteenth Amendment and Articles 24 and 26 (Counts II and VI); false arrest or false imprisonment under the Fourteenth Amendment and Articles 24 and 26 (Counts III and VII); battery (Count IX); false arrest or false imprisonment (Count X); malicious prosecution (Count XI); gross negligence (Count XII); and negligence (Count XIII). The remaining counts are against Baltimore County, Maryland and have been bifurcated.

2

## UNDISPUTED FACTS

On February 9, 2019, at approximately 8:25PM, officers were dispatched to an address for what dispatch referred to as a "burglary in progress." (Ex. A at 4.) Dispatch also noted that the caller stated "the location should be vacant and that there are subjects inside" and that "juveniles had broke [sic] into the location recently." (*Id.*) Officer Becketts's monitor en route indicates "SHOULD BE VACANT. SUBJS INSIDE." (Ex. B.) Officer Becketts knew that "we have a lot of burglaries over there, so we have a lot of legit calls where we come on scene and it's multiple subjects in houses just like that, that most of the time refuse to come to the door, sometimes open the door and we take them into custody." (Ex. C.) He had been on the scene in that housing complex more than ten times when an arrest for burglary was made. (Ex. C.)

Officer Ruiz arrives first at the location just before Officer Becketts and Becketts approaches the caller as Officer Ruiz speaks with her. (Ex. D. 2:57.)[1] The caller tells Officer Ruiz that "nobody lives there." (Ex. D. 2:59.) Officer Ruiz asks how they "got in there" and the caller says that "maybe they broke in the door … but somebody is in there." (*Id.* 3:04.) The caller says she "lives underneath so I called." The caller says that "earlier they was putting carpet in the house" and that "two to three weeks ago there were kids in there." (*Id.* 3:13–3:23.)

---

[1] References to footage from the body worn cameras of Officers Becketts (Exhibit D), White (Exhibits E and H) and Ruiz (Exhibit I)—contain references to the approximate time elapsed in each video.

3

Officer Becketts approaches the residence and the light over the front door is on but otherwise the house appears dark. (Ex. D. 3:36.) Officer Becketts knocks on the door and yells "Open the door" with his firearm drawn. (*Id.* 4:03.) The door opens and Plaintiffs Thomas Allotey and Caia Weaver appear and the interior is dimly lit. (*Id.* 4:08.) Officer Becketts says "Get the fuck on the ground now." (*Id.* 4:11.) Officer White has also arrived at the door and tells Mr. Allotey to twice get on the ground, firearm drawn. (Ex. E 5:10–12.) Mr. Allotey is wearing a coat. (Ex. D 4:11.) He says "we just moved in." (*Id.* 4:10–12.) Officer Becketts steps a few feet inside and takes Mr. Allotey's wrist for couple of seconds to lead him out (*Id.* 4:12) and then takes Ms. Weaver's wrist to lead her out. (*Id.* 4:15.) Mr. Allotey, agitated, says to Officer Becketts "What's up with you, you don't get off my girl." (Ex. D 4:18.) Officer Becketts sees what appear to be children come into the front room. (Id.; Ex. A at 4.)

Mr. Allotey then grabs Officer Beckett's hand and squeezes it. (Ex. A at 4.) Officer Becketts says to Mr. Allotey, "First of all don't touch me." (Ex. D 4:18.) Mr. Allotey responds, "Don't twist her arm." (*Id.* 4:19.) Mr. Allotey grabs Officer Becketts's wrist and "flexed it … bent it in a way, in a manner that he was attempting to hurt." (Ex. C.)

Officer Zaloudek-Hensley is now on the scene and attempts to take Mr. Allotey's arm. (Ex. E 5:21.) Mr. Allotey then becomes agitated, moves off the front steps, and yells, "What the fuck's wrong with you?" (*Id.* 5:21–22.) Mr. Allotey is 6'2″ and weighs 250 pounds (Ex. A at 7.)

Officer Becketts tells Mr. Allotey to "get your hands behind your back now." (Ex. D 4:27.) Then Officer Becketts and at least one other officer tell Mr. Allotey to put his hands behind his back six more times while he continues to resist. (*Id.* 4:27–34.) Officer Becketts uses pepper spray on Mr. Allotey for less than a second. (Ex. E 5:35.) Officer Becketts again tells Mr. Allotey to "put 'em behind your back." (Ex. D 4:40.) Mr. Allottey still refuses to put his right arm behind his back and two other officers are struggling with him. (Ex. D 4:43.) The officers then take Mr. Allotey to the ground. (*Id.* 4:44–45.)

Three more times, one or more officers tell Mr. Allotey to put his arms behind his back. (Ex. D 4:48–5:00.) Mr. Allotey yells to Ms. Weaver, "Get your phone, record this shit!" (*Id.* 4:52.) After being told to put his arms behind his back, he looks back at the officers and says "No." (Ex. E 5:56–58.) The struggle continues, with Mr. Allotey moving side to side to resist. (*Id.* 5:59–6:01.) Mr. Allotey then puts his left hand by his head and not behind his back, an officer grabbing the hand to put it behind his back. (Ex. D 5:00; Ex. F.) Three times an officer tells Mr. Allotey, "Put your arm behind your back." (Ex. D 5:06.) The struggle continues and three more times one or more officers tell Mr. Allotey give them his hands or put his hands behind his back. (*Id.* 5:13.) At least three officers are attempting to control him. (*Id.*) At this point, Mr. Allotey's left hand is not behind his back but on the ground. (Ex. D 5:14; Ex. G.)

Officer Becketts then strikes Mr. Allotey twice in the face (Ex. D 5:16–23) while an officer attempts to handcuff Mr. Allotey (*Id.* 5:19) and another officer tells him twice to put his arms behind his back. (*Id.* 5:20, 5:23.) An officer tells him twice to

"give us your arm now." (*Id.* 5:28, 5:36.) At least two officers tell him to "relax." (*Id.* 5:37.) Mr. Allotey calls Officer Becketts a "fuckin' whore." (*Id.* 5:38.) Am officer tells him to "give us your arm.") (*Id.* 5:39.) Mr. Allotey calls Officer Becketts a "bitch." (Ex. D 5:40.) An officer twice more tells Mr. Allotey to "give us your arm" and an officer tells Mr. Allotey, "give us your arm so this can end." (*Id.* 5:41.) Three more times an officer tells Mr. Allotey to comply by giving his arm. (*Id.* 5:45–47.) Mr. Allotey again calls Officer Becketts a "bitch." (*Id.* 5:49.) An officer again tells Mr. Allotey, "give us your arm." (*Id.* 5:50.) Mr. Allotey continues to resist, shouting racial slurs and "bitch." (*Id.* 6:06–08.) An officer tells Mr. Allotey, "Stop resisting. Gives us your arm." (*Id.* 6:10.) An officer tells Mr. Allotey twice more to "give us your arm." (*Id.* 6:12, 6:22.) The officers finally get Mr. Allotey under control and in handcuffs and help him to his feet. (*Id.* 6:32–6:36.) In total, Mr. Allotey was told approximately 36 times to give the officers his hands or put them behind his back.

Mr. Allotey yells "Where your bitch ass at?" (Ex. D 6:38–39.) He calls Officer Becketts a "bitch" (*Id.* 6:50) and yells at him, "you hit like a whore." (Ex. D 6:52.) As Officer Becketts helps lead Mr. Allotey to a police car, he becomes belligerent again, and Officer Becketts tells him to "calm down." (*Id.* 7:12.) Mr. Allotey responds angrily, getting in Officer Becketts's face and calling him a "bitch ass n*****." (*Id.* 7:13–14.) Officer Becketts again tells him to "calm down" and "relax." (*Id.* 7:14, 7:20.) Mr. Allotey repeatedly calls Officer Becketts a "bitch" and then tells Officer Becketts to "put on a KKK hood, you bitch ass n*****." (Ex. H 00:01–35.)

After Mr. Allotey is in custody in the police car, Officer Ruiz asks Officer Becketts, "What did he do when you opened the door?" (Ex. I 12:00–01.) Officer Becketts tells her, "He grabbed my arm and … started tensing my shit." (Ex. I 12:03–07.)

A medic is summoned to the scene to treat Mr. Allotey for pepper spray exposure. (Ex. A at 5.) At the police station following his arrest, Mr. Allotey shows no apparent injuries. (Ex. J.) The next day, Mr. Allotey seeks medical attention but has no significant injures, merely a bruise and a sprained wrist. (Ex. K.)

Officer Pearson was not present and his only involvement was processing Plaintiff Allotey after his arrest and arrival at the Woodlawn Precinct. (Ex. L.)[2]

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987) (internal quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for

---

[2] Officer Pearson is thus entitled to judgment on all claims against him.

the non-moving party, there is no genuine issue for trial." *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, No. 20-1583, 2022 WL 1672142, at *3 (4th Cir. May 26, 2022) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, summary judgment is appropriate when, "after adequate time for discovery and upon motion, ... a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Walton v. Harker*, 33 F.4th 165, 171 (4th Cir. 2022) (quoting *Celotex*, 477 U.S. at 322).

"In determining whether an officer is entitled to summary judgment on the basis of qualified immunity, courts engage in a two-pronged inquiry." *Tolan v. Cotton,* 572 U.S. 650, 655 (2014) (per curiam). The first asks whether the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a federal right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Tolan*, 527 at 655.

SUMMARY OF ARGUMENT

Officer Becketts had reasonable suspicion that a burglary was being committed inside a residence. He was thus entitled to enter the residence and use minimal force to move Plaintiffs outside for further investigation. Given the factual circumstances, Defendants were entitled to detain Plaintiff Allotey in handcuffs while investigating the suspected crime. Plaintiff Allotey's physical resistance to detention for the purposes of investigation and his assault of Officer Becketts were crimes and made

him subject to arrest. Defendants' use of force to restrain and handcuff Plaintiff Allotey was reasonable given his physical resistance to being placed in handcuffs, his failure to follow multiple verbal commands to cooperate, the severity of the crime at issue, and Defendants' reasonable concern for their safety.

## ARGUMENT

### I.   BECAUSE OFFICER BECKETTS HAD REASONABLE SUSPICION THAT A CRIME WAS BEING COMMITTED, HIS ENTRY INTO THE RESIDENCE WAS LAWFUL.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As first established in *Terry v. Ohio*, 392 U.S. 1 (1968), consistent with the Fourth Amendment, "[a]n officer may stop and briefly detain a person 'when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'" *United States v. Montieth*, 662 F.3d 660, 665 (4th Cir. 2011) (quoting *United States v. Hensley*, 469 U.S. 221, 227 (1985)). The determination of reasonable suspicion must "give due weight to 'commonsense judgments and inferences about human behavior" made by officers in light of their experience and training." *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). "The standard 'depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (emphasis omitted) (quoting *Navarette v. California*, 572 U.S. 393,

402 (2014)). Thus, while the standard requires "more than an 'inchoate and unparticularized suspicion or hunch," *Wardlow*, 528 U.S. at 124 (quoting *Terry*, 392 U.S. at 27, courts must also "credit[ ] the practical experience of officers who observe on a daily basis what transpires on the street," *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993).

Here, the Defendants were dispatched to an address for what dispatch referred to as a "burglary in progress." (Ex. A at 4.) Dispatch also noted that the caller stated that "the location should be vacant and that there are subjects inside" and that "juveniles had broke [sic] into the location recently." (*Id.*) The officers' monitor en route indicated "SHOULD BE VACANT. SUBJS INSIDE." (Ex. B.) Officer Becketts knew that "we have a lot of burglaries over there, so we have a lot of legit calls where we come on scene and it's multiple subjects in houses just like that, that most of the time refuse to come to the door, sometimes open the door and we take them into custody." (Ex. C.) Officer Becketts had been in that housing complex more than ten times when someone was arrested for burglary. (Ex. C.)

Officer Becketts heard the neighbor/caller tell Officer Ruiz that "nobody lives there." (Ex. D. 2:59.) Officer Ruiz asked how they "got in there" and the caller says that "maybe they broke in the door … but somebody is in there." (Id. 3:04.) The caller said she "lives underneath so I called." The caller said that "earlier they was putting carpet in the house" and that "two to three weeks ago there were kids in there." (*Id.* 3:13–3:23.)

When Officer Becketts approached the residence the house appeared dark, with no interior lights visible from outside. (Ex. D. 3:36.) When the door opens, Plaintiffs Thomas Allotey and Caia Weaver appear. (Ex. D. 4:08.) Mr. Allotey is wearing a coat. (Ex. D 4:11.)

All of these undisputed facts together provide a reasonable, articulable suspicion that a burglary was in progress and that the Plaintiffs, two adults inside a dark residence, were the perpetrators. Numerous courts have found reasonable suspicion on far fewer supporting facts.

The Fourth Circuit Court of Appeals found reasonable suspicion of a burglary based solely on a burglar alarm going off late at night in an area the officer knew was a "high crime neighborhood." *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987) (court "may properly consider the criminal propensity of the patrolman's beat as one of several factors" to support reasonable suspicion); *see also United States v. Craig*, 306 Fed. Appx. 256, 262 (6th Cir. 2009) (court finding reasonable suspicion in part because "Importantly, all of this occurred in a setting plagued by auto thefts and burglaries"). The officer further had reasonable suspicion the defendant had committed a crime based solely on his being near the building. *Id.* In fact, the Court concluded just the burglar alarm "provided a reasonable basis for believing that a burglary had occurred at the Center. If the policeman were first required to verify all the circumstances of the crime, the opportunity to catch the criminal might be lost." *Id.* at 1107.

In *Gale v. O'Donohue*, 824 Fed. Appx. 304, 306 (6th Cir. 2020), the Sixth Circuit Court of Appeals found reasonable suspicion of an attempted breaking and entering based just on an anonymous caller at night claiming that her husband answered the door after "a strange man ... all by himself" knocked on their door and "said there's a police type thing around here ... and he wanted to help [the homeowners]." In *United States v. Snow*, 656 F.3d 498, 502 (7th Cir. 2011), the Seventh Circuit Court of Appeals found reasonable suspicion solely on a caller "reporting initially that she had seen a man attempting to crawl through a front window, and later that the individual had gone around the back of the home and then emerged on the side of the house."

This reasonable suspicion also provided exigent circumstances for Officer Becketts to enter the house. The Fourth Amendment favors a warrant based on probable cause, but "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart,* 547 U.S. 398 (2006).  Such exceptions are when "exigent circumstances justify the warrantless search of a home ... or when the need for on-the-spot response justifies a search and seizure based on reasonable suspicion. *Mora v. The City Of Gaithersburg, MD*, 519 F.3d 216, 222 (4th Cir. 2008). "The lesson of these cases is clear: We are to approach the Fourth Amendment ... with at least some measure of pragmatism. If there is a grave public need for the police to take preventive action, the Constitution may impose limits, but it will not bar the way." *Id. See Figg v. Schroeder*, 312 F.3d 625, 639 (4th Cir. 2002) ("For police officers successfully to assert the exigent circumstances doctrine, they need only possess a 'reasonable suspicion'

that such circumstances exist at the time of the search or seizure in question" and "courts should not engage in 'unreasonable second-guessing' of the officers' assessment of the circumstances that they faced.") (citing *United States v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985)). Accordingly, this Court has explicitly stated that "reasonable suspicion" is sufficient "to enter a residence to effect a *Terry* stop." *United States v. Dupree*, No. CRIM.A. RDB-13-00256, 2013 WL 4499037, at *6 (D. Md. Aug. 20, 2013).

Based on these principles, "[p]olice generally have been found to be justified in entering a home in response to a reported burglary or home security alarm, even absent a warrant, so long as the totality of the facts and circumstances support the likelihood that a burglary may be in progress." *United States v. Porter*, 288 F. Supp. 2d 716, 720–21 (W.D. Va. 2003). In *Reardon v. Wroan*, 811 F.2d 1025 (7th Cir. 1987), police responded to a reported burglary in progress. The police knew the location was a fraternity house, the university students were on a break, and that burglaries occurred more frequently at such times. *Id.* at 1026. When police arrived they found the back door unlocked and the house was dark. *Id.* Even if the higher standard of probable cause were not present, the Seventh Circuit Court of Appeals found these circumstances sufficient to entry into the house. *Id.* at 1030.

Other courts under similar conditions have reached the same result. *See Bilida v. McCleod*, 211 F.3d 166 (1st Cir.2000) (officer's entry into fenced backyard in response to silent security alarm sufficient to justify warrantless entry); *United States v. Tibolt,* 72 F.3d 965, 970–71 (1st Cir.1995) (security alarm, along with

unlocked rear door, supported officers' reasonable suspicion of a possible break-in justifying entry); *Murdock v. Stout*, 54 F.3d 1437 (9th Cir.1995) (officers' observation of open patio door and failure to elicit a response from resident when circumstances suggested that a resident should have been present supported finding of exigent circumstances); *United States v. Johnson*, 9 F.3d 506 (6th Cir.1993) (officer's observation of broken window while responding to burglary report justified warrantless entry); *United States v. Dighera*, 2 F.Supp.2d 1377 (D.Kan.1998) (officer responding to security alarm with no response within residence permitted to enter). When faced with reasonable suspicion of a burglary or break-in, police not only have the right to investigate, they "have a duty to investigate, and, when the facts and circumstances suggest reasonable suspicion that an exigency exists, to enter the home. In the face of such circumstances, '[i]t would defy reason to suppose that [law enforcement officers] had to secure a warrant before investigating, leaving the putative burglars free to complete their crime unmolested.'" *Porter*, 288 F. Supp. 2d at 721–22 (quoting *United States v. Singer*, 687 F.2d 1135, 1144 (8th Cir.1982)). *Accord United States v. Brown*, 449 F.3d 741, 750 (6th Cir. 2006). Defendants are entitled to judgment on all claims based on entering the residence; Count III is the only claim that is explicitly based on entering the residence.

## II.   BECAUSE THERE WAS REASONABLE SUSPICION THAT A CRIME WAS BEING COMMITTED, DETENTION OF PLAINTIFFS WAS LAWFUL.

Defendants are entitled to judgment on Plaintiffs' claims based on Officer Becketts grabbing their arms to guide them out of the residence and the attempt to place Mr.

Allotey in handcuffs. The Supreme Court "has long recognized that the right to make an … investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). *See Terry,* 392 U.S., at 22–27. The record shows that, at most, Officer Becketts briefly grabbed first Mr. Allotey's arm and then Ms. Weaver's, to remove them from the residence. Numerous courts have explicitly rejected claims that such specific action by an officer investigating a crime violates the Fourth Amendment. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989) (grabbing a suspect's arm and moving him onto a sidewalk does not violate the Fourth Amendment); *Karadi v. Jenkins*, 7 Fed. Appx. 185, 194 (4th Cir. 2001) (if moving a suspect is within the scope of a *Terry* stop, officer "has the right to use force to compel [suspect] to move"); *Glass v. Robinson*, No. CV-19-04883-PHX-ROS, 2022 WL 252395, at *3 (D. Ariz. Jan. 27, 2022) (reasonable suspicion permits police "to use some force to prevent [suspect] from leaving the scene during the *Terry* stop"); *Johnson v. Dep't of Alcoholic Beverage Control*, No. 3:15-CV-00055, 2016 WL 7235836, at *5 (W.D. Va. Dec. 13, 2016) (given police had reasonable suspicion, "court cannot agree that grabbing [suspect]'s arm, holding on to his elbow, 'attempt[ing] to twist' his arm behind his back, and grabbing his left arm were objectively unreasonable ways to effectuate such investigatory stop"); *Carroll v. Ellington*, 800 F.3d 154, 170 (5th Cir. 2015) (restraining suspect's arm was valid Terry stop) *United States v. Lopez*, 321 Fed. Appx. 65, 67 (2d Cir. 2009) (grabbing suspect's right arm while conducting a valid *Terry* stop).

When it comes to any claim based on the assertion that placing Mr. Allotey in handcuffs was unlawful, case law also compels the conclusion that Defendants are entitled to judgment. A "brief but complete restriction of liberty is valid under *Terry." United States v. Moore*, 817 F.2d 1105, 1108 (4th Cir. 1987). *See United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010) ("even a complete restriction of liberty is valid under *Terry* if the restriction is brief"); *U.S. v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir.1995) (same). A lawful stop also does not necessarily become a custodial arrest when circumstances cause police officers to draw their guns, or handcuff suspects. *United States v. Sinclair,* 983 F.2d 598, 602 (4th Cir.1993) (holding that drug dealers were not in custody merely because law enforcement officers drew their guns during a *Terry* stop as a reasonable safety precaution); *United States v. Crittendon,* 883 F.2d 326, 328 (4th Cir.1989) (holding that a stop and frisk is not necessarily converted into an arrest when defendant was handcuffed prior to the pat down search); *United States v. Perdue*, 427 F. Supp. 2d 671, 673 (W.D. Va. 2006), *aff'd,* 228 Fed. Appx. 269 (4th Cir. 2007) ("The mere handcuffing of an individual alone is not sufficient to transform an otherwise permissible *Terry* stop into a full-blown arrest."). Thus, any claim that probable cause, not mere reasonable suspicion, was necessary for the officers to place Mr. Allotey in handcuffs are erroneous.

Handcuffing a suspect during an investigation is lawful if, under the specific circumstances, doing so is "reasonably necessary to protect [officers'] personal safety and to maintain the status quo during the course of the stop." *United States v.*

16

*Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995). *See United States v. Avagyan*, 164 F. Supp. 3d 864, 897 (E.D. Va. 2016), *aff'd sub nom. United States v. Ghazaryan*, 685 Fed. Appx. 222 (4th Cir. 2017) (reasonable, articulable, particularized suspicion that [suspect] had committed a crime plus an articulable safety concern" justifies moving and handcuffing suspect); Maryland law recognizes the same principles. *See*, *e.g.*, *Longshore v. State*, 399 Md. 486, 514 (2007) (use of handcuffs during investigation permissible if "suspicion that a violent crime had occurred" or "reason to believe that [suspect] was armed or dangerous"); *Trott v. State*, 138 Md. App. 89, 118–19 (2001) (handcuffing suspect during investigatory stop permissible based in part on "widespread agreement among the federal courts that, under certain circumstances, the handcuffing of a suspect during an investigative stop would not constitute an arrest.")

Here, there were specific, articulable facts that made placing Mr. Allotey in handcuffs reasonable. The incident took place at night, in a not particularly well lit area. Mr. Allotey had a jacket or coat on, making it easier to conceal a firearm or other weapon, and courts have recognized that burglary calls are inherently dangerous for police. *See, e.g., Quarles v. United States*, 139 S. Ct. 1872, 1879 (2019) ("Burglary is dangerous because it 'creates the possibility of a violent confrontation between the offender and an occupant, caretaker, or some other person who comes to investigate.'") (quoting *Taylor v. United States*, 495 U.S. 575, 588); *Sykes v. United States*, 564 U.S. 1, 9 (2011) ("[b]urglary is dangerous because it can end in confrontation leading to violence.") *Taylor*, 495 U.S. at 588 (burglaries at night may

17

be "especially dangerous"). Mr. Allotey had already shown an unwillingness to cooperate and hostility toward the police: he had grabbed and bent Officer Becketts's wrist, simply because he had briefly taken hold of Ms. Weaver to escort her outside and when Officer Zaloudek-Hensley attempted to take Mr. Allotey's arm, he became agitated, moved off the front steps, and yelled "What the fuck's wrong with you?" (Ex. E 5:21–22.) And Mr. Allotey is 6'2" and weighs 250 pounds (Ex. A at 7.) The Supreme Court has also recognized that "a *Terry* investigation … involves a police investigation at close range, when the officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make a quick decision as to how to protect himself and others from possible danger. In such circumstances, we have not required that officers adopt alternate means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter." *Michigan v. Long*, 463 U.S. 1032, 1052 (1983) (internal quotations and citations omitted). Because detaining Plaintiff Weaver was lawful based on reasonable suspicion and because placing handcuffs on Mr. Allotey for safety reasons and to maintain the status quo was reasonable, Defendants are entitled to judgment on all claims asserting that doing so was unlawful: Counts III, VII, and, as more fully explained below, Counts IX, X, and XI.[3] *See United States v. Perez*, 30 F.4th 369, 378 (4th Cir.

---

[3] Count VII is the parallel Maryland constitutional claim to the Count III federal constitutional claim. This Court has analyzed such parallel Maryland claims under the same framework as federal claims, given that under Maryland law, Articles 24 and 26 are "construed in pari material" with the Fourth and Fourteenth Amendments. *See, e.g., Littleton v. Swonger*, 502 Fed. Appx. 271, 274 (4th Cir. 2012);

2022) (detention short of arrest must be supported by reasonable suspicion); *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018) (same).

### III.   BECAUSE DEFENDANTS HAD PROBABLE CAUSE TO ARREST PLAINTIFF ALLOTEY, HIS ARREST WAS LAWFUL.

Even if placing Mr. Allotey in handcuffs was not reasonable in the context of an investigatory stop, doing so was still lawful because Mr. Allotey was subject to arrest. Under Maryland law, "A police officer may arrest without a warrant a person who commits or attempts to commit a felony or misdemeanor in the presence or within the view of the police officer" and "A police officer who has probable cause to believe that a felony or misdemeanor is being committed in the presence or within the view of the police officer may arrest without a warrant any person whom the police officer reasonably believes to have committed the crime." Md. Code Ann., Crim. Proc. § 2-202.

Probable cause means that "an objectively reasonable police officer, placed in the circumstances, had a reasonable ground for belief of guilt that was particularized with respect to the person to be ... seized." *United States v. Humphries*, 372 F.3d 653, 657-58 (4th Cir. 2004) (internal quotation marks omitted). An officer need not "resolve every doubt about a suspect's guilt before probable cause is established." *Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991); *see Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983) ("[P]robable cause requires only a probability or

---

*Thompson v. Badgujar*, No. 20-CV-1272-PWG, 2021 WL 3472130, at *11 (D. Md. Aug. 6, 2021.

substantial chance of criminal activity, not an actual showing of such activity."). Here, Defendants had probable cause to believe that Mr. Allotey committed three separate crimes: resisting arrest, second degree assault, and obstructing or hindering a police officer.

Mr. Allotey's prolonged, physical resistance to being placed in handcuffs was resisting arrest under Maryland law. *See* Md. Code Ann., Crim. Law § 9-408; *Rich v. State*, 205 Md. App. 227 (2012). And, under Maryland law, this is so even if the underlying investigatory stop is illegal. In *Riggins v. State*, the defendant was convicted of resisting arrest and argued on appeal that his conviction was erroneous because he had been resisting an illegal arrest. The Court of Special Appeals disagreed, upholding his conviction because he had used force to resist a *Terry* stop: "Appellant's use of force to thwart [the officer's] lawful *Terry* stop gave [the officer] probable cause to arrest appellant. A citizen may not use force to thwart a lawful *Terry* stop." 223 Md. App. 40, 63 (2015). Despite the court's use of "lawful," the same result would obtain even if the *Terry* stop were *illegal*. In *Barnhard v. State*, 86 Md. App. 518 (1991), *aff'd,* 325 Md. 602 (1992), the Court of Special Appeals, confronted again with a resisting arrest conviction, held that "there is no right to resist an "illegal" stop." *Id.* at 528. The Court based this conclusion on two grounds. First, to hold otherwise would make police officers "subject to attack in every instance when, during the course of their investigation, they temporarily detain someone. To recognize the right to resist such momentary seizures, short of an arrest, serves only to expand the danger of violence." *Id.* at 527–28. Second is the "distinction between a

stop and an arrest. The stop, while an intrusion on liberty, is slight compared to the deprivation of freedom that results from an arrest." *Id.* at 528. *See also Hicks v. State*, 189 Md. App. 112, 125 (2009) ("There is no privilege to resist either an unlawful *Terry* stop"). Thus, when Mr. Allotey forcibly resisted the Defendants' repeated attempts to place him in handcuffs, he committed the crime of resisting arrest and was subject to arrest for that crime. The Fourth Circuit Court of Appeals agrees, holding that "If a suspect's response to an illegal stop is itself a new, distinct crime, then the police constitutionally may arrest the [suspect] for that crime. There is a strong policy reason for holding that a new and distinct crime, even if triggered by an illegal stop, is a sufficient intervening event to provide independent grounds for arrest. … [a] contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." *United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997) (internal quotations and citations omitted).

Mr. Allotey also was subject to arrest for second degree assault when he grabbed and twisted Officer Becketts's wrist. Under Maryland law, the elements of second degree assault are " (1) the defendant caused offensive physical contact with, or harm to, the victim; (2) the contact was the result of an intentional or reckless act of the defendant and was not accidental; and (3) the contact was not consented to by the victim or was not legally justified." *United States v. Royal*, 731 F.3d 333, 341 (4th Cir. 2013) (quoting *Nicolas v. State*, 426 Md. 385, 403–4 (2012). Officer Becketts plainly had probable cause that Mr. Allotey had intentionally made physical

nonconsensual physical contact with him and because there is no right to resist even an illegal *Terry* stop, this intentional physical contact was not legally justified.

Once Mr. Allotey assaulted Officer Becketts or physically resisted the Terry stop the Defendants also had probable cause to arrest him for obstructing or hindering a police officer. In Maryland, "obstructing and hindering a law enforcement officer in the performance of his duty is a common law offense." *Titus v. State*, 423 Md. 548, 558 (2011). One category of conduct that falls under this crime is "positive direct obstruction, which includes those cases in which the constable acts directly against the citizen or his property and is physically resisted." *Id.* (internal quotation and citation omitted). Assault of a police officer is sufficient for this crime, and the obstruction or hindering can be of duties short of arrest. *Id.* at 528.

Defendants are entitled to judgment on the constitutional claims based on a lack of probable cause to arrest Mr. Allotey: Counts III and VII. *See Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002) ("To establish an unreasonable seizure under the Fourth Amendment, Brown needs to show that the officers decided to arrest her for disorderly conduct without probable cause"); *Dunbar v. Biedlingmaier*, No. CV DKC 20-0738, 2022 WL 814293, at *6 (D. Md. Mar. 17, 2022) "False arrest and false imprisonment claims brought under § 1983 are typically interpreted to allege 'a seizure of the person in violation of the Fourth Amendment.'" (quoting *Rogers v. Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001)). For the same reason, Defendants are entitled to judgment on Counts IX, X, and XI, as more fully explained below.

IV.   USE OF FORCE TO ARREST PLAINTIFF ALLOTEY WAS REASONABLE.

Defendants are also entitled to judgment on all claims based on Defendants having used excessive force against Plaintiffs. In assessing a claim of excessive force, courts must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Courts apply this standard by looking at least three factors: "the severity of the [suspected] crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. But "a court (judge or jury) cannot apply this standard mechanically." *Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). Rather, the inquiry "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. Those circumstances include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239, 2241 (2021) (quoting *Kingsley*, 576 U.S. at 397). A court must also "focus on the facts and circumstances confronting the officer 'immediately prior to and at the very moment' that force was used, and disregard information not known to the officer at that time." *Ray v. Roane*, 948 F.3d 222, 225 (4th Cir. 2020) (quoting *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991)).

Application of all of these factors weighs heavily in favor of Defendants and thus compels the conclusion that Defendants' use of force was reasonable under the Fourth Amendment and under Article 26.[4] Plaintiff Alottey[5] was suspected of burglarizing a residence, which in Maryland is a first degree felony punishable by up to twenty years in prison. Md. Code Ann., Crim. Law § 6-202. *See Phillips v. Blair*, 786 Fed. Appx. 519, 530 (6th Cir. 2019) ("because burglary constitutes a serious crime, this factor weighs in favor of the officers"); *Lowry v. City of San Diego*, 858 F.3d 1248, 1257–58 (9th Cir. 2017) (same).

Defendants reasonably feared that Mr. Allotey might be dangerous given (1) the inherent danger of burglary, (2) his hostility toward the police and physical resistance to simply being handcuffed, (3) his large size (4) his jacket, which could conceal a weapon, and (5) the incident took place at night in limited visibility. It is also irrelevant if the officers were mistaken as to the threat he posed. "The Fourth

---

[4] Count I brings an excessive force claim under the Fourteenth Amendment, rather than the Fourth Amendment. For this reason alone, Defendants are entitled to judgment on this claim. *See Knibbs v. Momphard*, 30 F.4th 200, 226 (4th Cir. 2022) (affirming summary judgment on such a claim because it "has been foreclosed by the Supreme Court since 1989").

[5] Although the Complaint appears at times to allege claims by Plaintiff Weaver based on excessive force, such claims clearly have no merit. At most, the record shows that Officer Becketts briefly grabbed her arm to move her outside the residence. This is not a violation of her rights. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396–97 (internal quotation marks and citation omitted). And "the right to make an … investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396.

24

Amendment does not require omniscience.... Officers need not be absolutely sure ...

of the nature of the threat or the suspect's intent to cause them harm—the

Constitution does not require that certitude precede the act of self protection." *Elliott*

*v. Leavitt,* 99 F.3d 640, 644 (4th Cir. 1996) (citing *Reese v. Anderson,* 926 F.2d 494,

501 (5th Cir. 1991) ("Also irrelevant is the fact that Crawford was actually unarmed.

Anderson did not and could not have known this.).

Plaintiff Allotey was also actively resisting for over two minutes, while the

officers repeatedly gave him verbal commands to cooperate so that force need not be

used. All told, the Defendants told Plaintiff about 36 times to cooperate by putting

his hands behind his back so that he could be handcuffed. The officers used no force

once Plaintiff Allotey was handcuffed. Plaintiff Allotey also suffered only minor

injuries: a bruise and sprained wrist.

Focusing on the specific force used does not change a calculus weighted in favor

of Defendants, especially given that "police officers are not required to make a perfect

decision in order to retain their immunity from paying civil damages." *Vandyke v.*

*Hall*, 743 F. Supp. 2d 561, 567 (W.D. Va. 2010) "The calculus of reasonableness must

embody allowance for the fact that police officers are often forced to make split-second

judgments—in circumstances that are tense, uncertain, and rapidly evolving—about

the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at

396–97; *see Elliot v. Cheney*, 99 F.3d 640, 642 (4th Cir.1996) (holding that a court

must consider the circumstances at the moment force was used, remembering that

"officers on the beat are not often afforded the luxury of armchair reflection").

Officer Becketts used pepper spray once, for less than a second, but only after Plaintiff had been resisting for about twenty seconds the efforts of multiple officers to handcuff him and officers had told him six times to put his hands behind his back. Under these circumstances, the brief, single use of pepper spray is not unreasonable under the Fourth Amendment. *See Padula v. Leimbach*, 656 F.3d 595, 603–04 (7th Cir. 2011) ("reasonable to use mace to attempt to control [suspect] under the circumstances, which involved a physical struggle both before and after placing him in handcuffs"); *see Brown v. City of Huntsville*, 608 F.3d 724, 739 (11th Cir.2010) ("[T]he use of pepper spray is not excessive force in situations where the arrestee poses a threat to law enforcement officers or others, uses force against officers, physically resists arrest, or attempts to flee...."); *Brooks v. City of Aurora, Ill.*, No. 10–3265, slip op. at 16, 2011 WL 2623507, at *6 (7th Cir. July 6, 2011) ("Courts often have held that it is reasonable to use pepper spray against a suspect who is physically resisting arrest...."); *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir.2002) ("Courts have consistently concluded that using pepper spray is reasonable ... where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital. (internal quotation marks and citations omitted)). In fact, "as a means of imposing force, *pepper spray is generally of limited intrusiveness*, and it is designed to disable a suspect without causing permanent physical injury. Indeed, *pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee.*" *Id.* (italics added); *Vandyke v. Hall*, 743 F. Supp. 2d 561, 567 (W.D. Va. 2010) (same); *Thomas v. Holly*, 533 Fed. Appx. 208, 217 (4th

Cir. 2013) (officer "acted reasonably in using his pepper spray, which is a non-lethal, and normally only temporarily incapacitating device, in an attempt to temporarily subdue Plaintiff and secure the scene"); *Guerrero v. Deane*, 750 F. Supp. 2d 631, 655 (E.D. Va. 2010), *aff'd sub nom. Guerrero v. Moore*, 442 Fed. Appx. 57 (4th Cir. 2011) (use of pepper spray reasonable "when the officers had not yet secured the scene, which was tense, uncertain, and still evolving" and "[t]he parties had not yet been detained"). Mr. Allotey also can present no evidence that he was injured by the pepper spray beyond the temporary discomfort pepper spray is intended to induce.

Likewise, Officer Becketts striking Plaintiff twice in the face is not an unreasonable use of force. Officer Becketts did so after Plaintiff Allotey had been actively resisting arrest for almost a minute and pepper spray had failed to induce Plaintiff Allotey's compliance. Plaintiff Allotey suffered no serious injury, such as a concussion, from being struck in the face. Officers had also instructed Plaintiff Allotey over twenty times to cooperate by putting his arms behind his back. Multiple federal courts, including in this circuit have found such use of force in similar circumstances reasonable. *See Dalton v. Liles*, No. 5:19-CV-00083-MR, 2021 WL 3493150, at *7 (W.D.N.C. Aug. 9, 2021) (striking a suspect reasonable use of force when done "in direct response to the Plaintiff's resistance to being handcuffed"); *Williams v. DeAngelis*, No. 1:07CV824 (LMB/TRJ), 2008 WL 3992634, at *6 (E.D. Va. Aug. 28, 2008) (striking suspect who was resisting arrest even after being pepper sprayed reasonable use of force); *Williams v. Ingham*, 373 F. App'x 542, 548 (6th Cir. 2010) (delivering closed-fist blows to plaintiff's back and applying a taser after he resisted

arrest following high speed car chase was objectively reasonable); *Duran v. Sirgedas*, 240 F. App'x 104, 118 (7th Cir. 2007) (no excessive force where officer struck suspect in leg with baton and punched him in the head with a closed fist, where suspect struggled with officers and bit one of them); *Prymer v. Ogden*, 29 F.3d 1208, 1210, 1216 (7th Cir. 1994) (kneeling on arrestee's back and several kicks to the ribs found objectively reasonable where arrestee resisted arrest and tried to strike officers); *Williams v. Hall*, No. 3:21-CV-556-RLM-MGG, 2021 WL 4125247, at *3 (N.D. Ind. Sept. 9, 2021), appeal dismissed, No. 21-2899, 2021 WL 8087203 (7th Cir. Dec. 22, 2021) ("punch to the face and hammer strikes were reasonable under the circumstances: Mr. Williams was actively fighting the officers' attempts to arrest him"). Conversely, courts have only found such force excessive when a suspect is in handcuffs and not actively resisting. *See, e.g., Young v. Prince George's Cnty.*, 355 F.3d 751, 757 (4th Cir. 2004) (finding a genuine issue of material fact existed as to whether defendants' actions were objectively reasonable as a matter of law when defendants threw plaintiff, who was already handcuffed, to the ground and struck him on the head and back), *Cowles v. Peterson*, 344 F. Supp. 2d 472, 482-84 (E.D. Va. 2004) (excessive use of force when defendant struck plaintiff in the head twice with a can of mace while plaintiff was not attempting to flee).

Additionally, it is clear that no rational jury could find any other defendant liable for excessive force based on the undisputed facts. No other officer used any force other than pushing or pulling on Plaintiff Allotey's arms to gain his compliance.

Defendants are entitled to judgment on all claims based on the use of excessive force: Counts I and V.

V. **BECAUSE THERE WAS PROBABLE CAUSE TO BELIEVE PLAINTIFF ALLOTEY HAD COMMITTED A CRIME, DEFENDANTS ARE ENTITLED TO JUDGMENT ON COUNTS II AND VI.**

Counts II and VI bring constitutional claims based on malicious prosecution. *Hupp v. Cook*, 931 F.3d 307, 323–24 (4th Cir. 2019) ("[A] plaintiff must show that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor" to prove a § 1983 malicious prosecution claim. (internal quotation marks omitted). *See Talley v. Anne Arundel Cnty., Maryland*, No. CV RDB-21-347, 2021 WL 4244759, at *10 (D. Md. Sept. 17, 2021) (malicious prosecution claims as a Maryland constitutional claim analyzed as a federal claim); *Warren v. Montgomery Cnty.*, No. CIV. PJM 09-2510, 2012 WL 3779165, at *5 (D. Md. Aug. 30, 2012) (same). As explained above, Defendants possessed probable cause to believe that Plaintiff Allotey had committed at least three crimes under Maryland law. Thus, Plaintiff Allotey cannot prove the required element of "unsupported by probable cause" and Defendants are entitled to judgment on Counts II and VI. *See Zhao v. McClain*, No. 21-1024, 2022 WL 898035, at *1 (4th Cir. Mar. 28, 2022) ("To succeed on a claim of malicious prosecution under the Fourth Amendment, Zhao was required to demonstrate, inter alia, that probable cause did not support his arrest.").

## VI.   DEFENDANTS HAVE QUALIFIED IMMUNITY TO ALL FEDERAL CLAIMS.

Even if this Court concluded that Defendants had violated Plaintiffs' federal constitutional rights, they would still have qualified immunity to those claims and be entitled to judgment. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S.Ct. 548, 551 (2017) (per curiam) (internal quotation marks omitted). A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal quotation marks omitted). For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 137 S.Ct., at 551 (alterations and internal quotation marks omitted). In other words, immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.*

This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (internal quotation marks omitted). "[S]pecificity is especially important in the Fourth Amendment context, where ... it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S. at 12 (alterations and internal quotation marks omitted).

30

Here, there was no case law that would have placed any defendant on notice that their conduct violated a constitutional right. There was no case law that established that using minimal force to remove persons suspected of burglary from the alleged crime scene so that police can investigate further violated any right. There was no case law that established beyond doubt that placing a suspect in handcuffs for the officers' safety and to preserve the status quo under this fact situation violated any constitutional right. There was no case law that established that the brief use of pepper spray or striking a suspect a couple of times violated any constitutional right, when that suspect is actively resisting arrest and repeatedly ignoring requests to cooperate.

Conversely, there was ample case law, as discussed above, which would have put the officers on notice that their conduct was permissible: finding that no constitutional right was violated in similar situations, while at the same time finding the violation of a right only in starkly different situations. For example, when it comes to the use of force in this case, the only applicable case law finding any constitutional violation occurred after a suspect was in handcuffs or when they were not actively resisting. *See, e.g., Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 908 (4th Cir. 2016) ("punching or pepper spraying suspects in response to minimal, non-violent resistance" is excessive force); *Park v. Shiflett*, 250 F.3d 843, 852–53 (4th Cir. 2001) (use of pepper spray excessive force when suspect neither actively resisting nor attempting to evade arrest); There was no case law telling the officers that, beyond doubt, their conduct would have violated a constitutional right.

VII.    BECAUSE DEFENDANTS WERE LEGALLY ENTITLED TO DETAIN
        PLAINTIFFS AND DID NOT USE EXCESSIVE FORCE, DEFENDANTS ARE
        ENTITLED TO JUDGMENT ON THE STATE COMMON LAW TORTS.

Plaintiffs bring several claims under Maryland common law: Count IX (battery),

Count X (False arrest/false imprisonment), Count XI (malicious prosecution), Count

XII (gross negligence), and Count XIII (negligence). A necessary element of battery

and false arrest or false imprisonment is "no legal authority or justification for the

arresting officer's actions." *Hines v. French*, 157 Md. App. 536, 551 (2004) (quoting

*Williams v. Prince George's County*, 112 Md. App. 526, 554 (1996); *see also Ashton v.

Brown*, 339 Md. 70, 119–21 (1995). Here, as explained above, Defendants had legal

authority to both detain Plaintiffs for investigative purposes and to arrest Plaintiff

Allotey. Even with legal justification, police officers can be liable for battery if they

use excessive force. *Williams*, 112 Md. App. 526. at 554. As explained above,

Defendants' use of force reasonable as a matter of law. Thus, Defendants are entitled

to judgment on Counts IX and X.

Common law malicious prosecution requires that a plaintiff prove that that "1)

the defendant(s) instituted a criminal proceeding against the plaintiff; 2) the criminal

proceeding was resolved in favor of the plaintiff; 3) the defendant(s) instituted the

criminal proceeding without probable cause; and 4) the defendant(s) acted with

malice or for the primary purpose other than bringing the plaintiff to justice." *S.

Mgmt. Corp. v. Taha*, 378 Md. 461, 479 (2003). To the extent any Defendants other

than Officer Becketts instituted criminal proceedings against Plaintiff Allotey, no

rational jury could find that no probable cause existed to arrest and charge Plaintiff

Allotey with either second-degree assault, failure to obey, or resisting arrest (*see* ECF No. 1 ¶ 48), nor is there sufficient evidence in the record that any Defendant acted with malice or with a primary purpose other than criminal justice. Defendants are entitled to judgment on Count XI.

Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist." *Barbre v. Pope*, 402 Md. 157, 187 (2007) (quoting *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 635 (1985)). Defendants were legally entitled to detain Plaintiffs and arrest Plaintiff Allotey. The force used against Mr. Allotey, in attempting to detain and arrest him, was reasonable as a matter of law. Defendants also called for medical assistance to treat Mr. Allotey. (Ex. 4 at 5.) Therefore, no rational jury could find that any Defendant intentionally injured either Plaintiff or acted as if Plaintiffs had no rights and Defendants are entitled to judgment on Count XII.

Count XIII is a claim for negligence but Defendants are immune to such claims. Under Maryland law, public officials have immunity from liability for torts based on negligence. *See, e.g., Smith v. Danielczyk*, 400 Md. 98, 128–29 (2007); *DiPino v. Davis*, 354 Md. 18, 49 (1999); *Lee v. Cline*, 384 Md. 245, 258 (2004). Police officers are public officials for the purpose of this public official immunity. *Cooper v. Rodriguez*, 443 Md.

680, 727 (2015). This immunity applies when the public official is performing a discretionary act rather than a ministerial one. *Ashburn v. Anne Arundel Cnty.*, 306 Md. 617, 622 (1986). *See Houghton v. Forrest*, 412 Md. 578, 585 (2010) (public official immunity applies to public officials "who perform negligent acts during the course of their discretionary (as opposed to ministerial) duties.") (citation omitted). "When applied to public officials, discretion is the power conferred upon them by law to act officially under certain circumstances according to the dictates of their own judgment and conscience and uncontrolled by the judgment or conscience of others." *Cooper*, 443 Md. At 713 (quoting *Livesay v. Balt. Cnty.*, 384 Md. 1, 16 (2004). An action is ministerial if "it is a duty that has been positively imposed by law, and its performance is required at a time and in a manner, or upon conditions which are specifically designated." *D'Aoust v. Diamond*, 424 Md. 549, 588–89 (2012) (internal citation omitted). Here, Defendants' alleged actions were discretionary. There is no allegation in the Complaint that Defendants were performing a ministerial act or that he violated a ministerial duty. *See James v. Prince George's County*, 288 Md. 315, 326–27 (1980) (ministerial duty is one that is "absolute, certain, and imperative, involving merely the execution of a set task," and a discretionary duty as one "to be exerted or withheld according to his own judgment as to what is necessary and proper.") (internal quotation omitted). Defendants are entitled to judgment on Count XIII.

## CONCLUSION

For the reasons stated, the Court should enter judgment for Defendants on all claims.

34

Respectfully submitted,

**JAMES R. BENJAMIN, JR.**

Baltimore County Attorney

/s/_____
Jennifer R. Frankovich
Assistant County Attorney
Bar No.: 26052
jfrankovich@baltimorecountymd.gov

/s/_____
Bradley J. Neitzel
Assistant County Attorney
Bar No.: 26787
Baltimore County Office of Law
400 Washington Avenue, 2nd Floor
Towson, Maryland 21204
(410) 887-2364
(410) 296-0931 (facsimile)
bneitzel@baltimorecountymd.gov
*Counsel for Defendants*

35