**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **ALLOTEY, et al**, | \* | |
| *Plaintiffs*, | \* | |
| v. | \* | Civil Case No: 1:21-cv-02288-JMC |
| **BALTIMORE COUNTY,** **MARYLAND, et al**, | | |
| | \* | |
| *Defendants.* | | |

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

**MEMORANDUM OPINION**

Plaintiffs Thomas Allotey ("Mr. Allotey") and Caia Weaver ("Ms. Weaver") filed an Amended Complaint alleging eleven counts against six individual Baltimore County Officers.[1] (ECF No. 14). The claims include, among other Maryland state law claims, excessive force, malicious prosecution, and false arrest and imprisonment all under both the United States Constitution and the Maryland Declaration of Rights. *Id.* at pp. 11–25.[2] The six individual Baltimore County officers include: 1) Officer S. Becketts, (2) Officer Ruiz, (3) Officer White, (4) Officer G. Wade, (5) Officer Zaloudek-Hensley, and (6) Officer A. Pearson. *Id.* pp. 1–2. Presently before the Court is Defendants' Motion for Summary Judgment (ECF No. 40). In determining this Motion, the Court further considered Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (ECF No. 49) and Defendants' Reply in Further Support of Motion for Summary Judgment (ECF No. 50). No hearing on this Motion is necessary. *See* Loc. R. 105.6 (D. Md. 2021).

---

[1] Plaintiffs alleged other counts against Defendant Baltimore County, but those counts have been bifurcated.

[2] The Court's pin cites refer to the page numbers provided within the electronic filing stamps located at the top of each electronically filed document.

For the reasons explained below, Defendants' Motion is GRANTED in part and DENIED in part, and partial summary judgment is GRANTED in favor of Plaintiffs as to Counts III and VII.

## I.      STATEMENT OF FACTS

The following facts are undisputed or set forth in the light most favorable to Plaintiffs. On February 9, 2019, at approximately 8:25 p.m., Baltimore County Police Officers were dispatched to 2536 Cheshaire Drive, Gwynn Oak, MD 21244 for a "burglary in progress." (ECF No. 40-3 at p. 4; ECF No. 14 at p. 6). The 911 call that led authorities to believe that a burglary was in progress was placed by the occupant of the apartment beneath Plaintiffs' townhouse, Ms. Ajovane Caba. (ECF No. 40-3 at p. 4). The dispatch call informed the officers that "the location should be vacant and that there are subjects inside." *Id.* Additionally, dispatch informed the officers that "juveniles had broke[n] into the location recently." *Id.* While traveling to the location of the suspected burglary, Officer Becketts' cruiser monitor indicated "SHOULD BE VACANT. SUBJS. INSIDE." (ECF No. 40-4 at p. 1). Officer White's cruiser monitor contained the same information. (ECF No. 40-7, Ex. E at 00:01). Furthermore, Officer Becketts was aware that the caller who placed the 911 call lived in an apartment underneath the townhouse in which the alleged burglary was occurring. (ECF No. 49-2 at p. 15). Officer Becketts was also aware that Ms. Caba had advised that maintenance had been in the townhouse in question changing out carpet earlier that day. *Id.* Officer Becketts was familiar with the location to which he was being dispatched, and he knew there had been "a lot of burglaries over there, so we have a lot of legit calls where we come on-scene and it's multiple subjects in houses just like that, that most of the time refuse to come to the door, sometimes open the door and we take them into custody." (ECF No. 40-5 at p. 1). On more than ten prior occasions, Officer Becketts had been on-scene for arrests made in the housing complex wherein the incident giving rise to this case occurred. *Id.* at p. 2.

Officer Becketts arrived at the scene and approached fellow Officer Cinthia Ruiz and Ms. Caba. (ECF 40-6, Ex. D at 2:57). Ms. Caba informed Officer Ruiz that "nobody lives there." *Id.* at 2:59. When Officer Ruiz asked Ms. Caba how the suspects "got in there," Ms. Caba replied that she did not know, but "maybe they broke a door . . . but somebody is in there." *Id.* at 3:00. After stating that she lived underneath the townhouse in question, Ms. Caba informed Officer Ruiz that "earlier they was putting carpet in this house, but it maybe two/three weeks ago they was some kids in there they lost their cell phones." *Id.* at 3:08. At this point, Officer Becketts interjected into the conversation between Ms. Caba and Officer Ruiz, and Officer Becketts confirmed that there was only one way in and one way out of the townhouse. *Id.* at 3:22. After Ms. Caba confirmed that there was only a front door and an elevated back door on a balcony, Officer Becketts proceeded to the front door of the townhouse. *Id.* at 3:51. A light shining over the front door illuminated the door and front steps, but the townhouse otherwise appeared dark. *Id.* at 3:47. While at the front door, Officer Becketts could hear voices from within the townhouse. (ECF No. 49-2 at pp. 20–21). Officer Becketts then asked Officer Ruiz to go around the back of the townhouse. *Id.* at p. 21; (ECF No. 40-6, Ex. D at 4:02). Officer Becketts heard no sounds of violence or struggle, and he heard no screaming or anything other than talking volume voices inside the townhouse. (ECF No. 49-2 at pp. 20–21). Officer Becketts did not notice any signs of forced entry into the front of the residence, and Officer Ruiz did not radio to Officer Becketts any signs of forced entry from the back of the townhouse. *Id.* at p. 25.

With his flashlight-equipped handgun drawn and pointed at the door, Officer Becketts, without knocking, yelled "open the door!" (ECF No 40-6, Ex. D at 4:03). At this point, Officer White was on-scene, approaching from the left of Officer Becketts, and also had his gun drawn. (ECF No. 40-7, Ex. E at 5:08). Officer Ruiz was located at the corner of the row of townhouses

connected to Plaintiff's townhouse. (ECF No. 40-11, Ex. I at 6:08). Within eight seconds of Officer Becketts' command, Plaintiffs opened the door. (ECF No. 40-6, Ex. D at 4:09). Ms. Weaver clearly had her left hand raised in the air above her head, and Mr. Allotey's left hand was also visible and empty. *Id.* Mr. Allotey immediately began asserting that "we just moved in!" *Id.* Mr. Allotey appeared to be wearing a leather jacket. *Id.* While standing outside the townhouse and pointing his handgun directly at Plaintiffs, Officer Becketts yelled for Plaintiffs to "get the fuck on the ground, now!" *Id.* at 4:10. Officer White also commanded Plaintiffs to get on the ground. (ECF No. 40-7, Ex. E at 5:10).

Officer Becketts then proceeded to enter the townhouse and grab Mr. Allotey's left wrist while still aiming the handgun at both Plaintiffs. (ECF No. 40-6, Ex. D at 4:10). While still holding Mr. Allotey's left wrist, Officer Becketts directed Mr. Allotey through the front door and said, "Let's go." *Id.* at 4:13. Upon Officer Becketts' entry into the townhouse, one child was visibly standing in a doorway leading out of the front room of the home. *Id.* As Mr. Allotey was walking out of his home, Officer White repeatedly commanded him to get on the ground. (ECF No 40-7, Ex. E at 5:11). Officer White responded to Mr. Allotey's repeated assertions that "we just moved in" by stating "alright alright just get on the ground." *Id.* at 5:14. After directing Mr. Allotey out of the home, Officer Becketts grabbed Ms. Weaver's left wrist and instructed her to proceed outside. (ECF No. 40-6, Ex. D at 4:13). While this was happening, Mr. Allotey continuously asserted that Plaintiffs had just moved in, and Officer Becketts continued pointing his gun in the direction of Plaintiffs. *Id.* at 4:17. At this point, the child initially visible in the doorway leading out of the front room was standing in the front room. *Id.* Plaintiffs had been in their home with their seven-year-old child and two-year-old twins. (ECF No. 14 at p. 6).

Mr. Allotey then became agitated at Officer Becketts and stated, "Like what's up with you, you don't get off my girl." (ECF No. 40-6, Ex. D at 4:17). Officer Becketts alleges that Mr. Allotey grabbed Officer Becketts' hand and squeezed it. (ECF No. 40-3 at p. 4). Mr. Allotey does not admit to grabbing Officer Becketts' hand. Another Defendant at the scene, Officer Wade, assisted with the arrest and does not recall seeing Mr. Allotey assaulting any officer. (ECF No. 49-7 at p. 13). Officer Becketts responded to the alleged grabbing of his wrist by stating, "First of all, don't touch me." (ECF No. 40-6, Ex. D at 4:18). Mr. Allotey responded by stating, "Don't twist her arm." *Id.* Officer Becketts alleges that Mr. Allotey grabbed his wrist and "flexed it, meaning he bent it in a way, in a manner that he was attempting to hurt . . . ." (ECF No. 49-2 at p. 35). Officer Becketts claims that Mr. Allotey held on to Officer Becketts' wrist for "a little longer" after Officer Becketts released Ms. Weaver. *Id.* at p. 41. At this point of further escalation, Officer Zaloudek-Hensley attempted to take Mr. Allotey's arm. (ECF No. 40-7, Ex. E at 5:21).

Whether resulting from a stumble by Mr. Allotey or a push by Officer Becketts, Mr. Allotey ended up standing in the small front yard and sidewalk area of the townhouse. (ECF No. 40-7, Ex. E at 5:20). The Officers then repeatedly asked Mr. Allotey to put his arms behind his back. *Id.* After approximately nine seconds from the time Officer White directed Mr. Allotey to place his arms behind his back, Officer Becketts used pepper spray on Mr. Allotey. *Id.* at 5:34. In conjunction with using the pepper spray on Mr. Allotey, Officer Becketts stated, "I don't got time for this." *Id.* In addition to pepper spraying Mr. Allotey in the face, Officer Becketts pepper sprayed Officer Zaloudek-Hensley in the face, as well. (ECF No. 49-3 at p. 16). Mr. Allotey began coughing and, after more repeated instructions to put his arms behind his back, was taken to the ground. (ECF No. 40-7, Ex. E at 5:45). While he was on the ground, at least four officers piled on Mr. Allotey. (ECF No. 49-2 at p. 65). Mr. Allotey directed Ms. Weaver to "get the phone, record

this shit!" (ECF No. 40-7, Ex. E at 5:49). After several more orders directing Mr. Allotey to place

his arms behind his back, Officer Becketts struck Mr. Allotey with a closed fist more than three

times. (ECF No. 40-6, Ex. D at 5:16–25; ECF No. 49-2 at p. 49). Officer Zaloudek-Hensley, who

was standing directly in the middle but to the side of Officer Becketts and Mr. Allotey when Mr.

Allotey allegedly grabbed Officer Becketts, claims that she was unaware of any crime that

Plaintiffs had committed at the time Mr. Allotey was struck by Officer Becketts or physically

restrained by the officers. (ECF 49-3 at p. 10–11). After several more orders directing Mr. Allotey

to place his arms behind his back, several racial slurs and verbal insults from Mr. Allotey directed

towards Officer Becketts, and the joint effort of at least five officers, the officers finally succeeded

in getting Mr. Allotey under their control and in handcuffs. (ECF No. 40-6, Ex. D at 5:21–6:32).

In total, it took the officers approximately two minutes to place Mr. Allotey in handcuffs after Mr.

Allotey was asked to place his arms behind his back in front of the house.

A medic was requested to treat Mr. Allotey for pepper spray exposure. (ECF No. 40-3 at

p. 5). Of note, as Mr. Allotey was being directed into a police cruiser for transport, the leather

jacket he was wearing was slumped off his shoulders and resting approximately halfway down his

back. (ECF No. 40-6, Ex. D at 6:50). After Mr. Allotey had been placed in a police vehicle, Officer

Ruiz asked Officer Becketts, "What did he do when you opened the door?" (ECF No. 40-11, Ex.

I at 12:00). Officer Becketts responded, "They were coming out, but he grabbed my arm when I

grabbed them all, and he's like 'get off me,' and he started twisting my shit." *Id.* at 12:01. Officer

Becketts admits that he felt "a little flash of heat of anger" and that his "adrenaline at that point

got up a little bit" after Mr. Allotey grabbed him. (ECF No. 49-2 at p. 57). Officer Wade, admits

that he did not see Mr. Allotey do anything that justified Mr. Allotey being maced. (ECF No. 49-

7 at p. 16).

Officer Becketts was the arresting and charging officer in connection with Mr. Allotey's arrest, and it was Officer Becketts' decision to arrest and charge him. (ECF No. 49-2 at p. 75). Officer Pearson assisted in the processing of Mr. Allotey after the latter was transported to the Woodlawn Precinct. (ECF No. 40-14 at p. 1). Mr. Allotey was charged with second degree assault on an officer, resisting arrest, and "other criminal incident."[3] (ECF No. 40-3 at pp. 1–2). Officer Becketts admits it is possible that he had a conversation with another officer discussing the potential need to charge Mr. Allotey to justify the force used against him. (ECF No. 49-2 at p. 79–80). Officer Becketts also admits that in exercising his discretion to charge somebody, he considers whether he used force. *Id.* at p. 80–81.

## II.    STANDARD OF REVIEW

### A.  Summary Judgment

Summary judgment may be granted to a moving party who demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A nonmoving party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)).

---

[3] Although Defense exhibits do not clearly indicate whether Mr. Allotey was charged with obstructing and hindering, Defendants argue that this is the third possible charge for which Defendants could have arrested Mr. Allotey. (ECF No. 40-1 at p. 20). The incident report indicates that the charges were: (1) "assault 2nd degree simple on police", (2) "other criminal incident," and (3) "resisting arrest."

The Court is "required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)). However, the Court must also "abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Heckman v. Ryder Truck Rental, Inc.*, 962 F. Supp. 2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). Consequently, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330–31 (4th Cir. 1998).

"[D]istrict courts may enter summary judgment *sua sponte* 'so long as the losing party was on notice that [they] had to come forward with all [their] evidence.'" *Velasquez v. Salsa and Beer Restaurant, Inc.*, 735 F. App'x 807, 809 (4th Cir. 2018) (quoting *Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646 (4th Cir. 2017) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)). The Fourth Circuit has stated that:

> The notice must be sufficient to provide the losing party with an adequate opportunity to demonstrate a genuine issue of material fact . . . [a]nd it must, in view of the procedural, legal, and factual complexities of the case, allow the party a reasonable opportunity to present all material pertinent to the claims under consideration.

*Velasquez*, 735 F. App'x at 809 (quoting *U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n*, 873 F.2d 731, 735 (4th Cir. 1989)) (other citation omitted); *see also Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 223–24 (3d Cir. 2004) (holding that adequate notice "mean[s] that the targeted party had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward." (internal quotation marks omitted)).

### B.  Qualified Immunity

"The doctrine of qualified immunity shields government officials from liability for civil damages when their conduct does not violate clearly established constitutional or other rights that a reasonable officer would have known." *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019) (quoting *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018)). "The doctrine is intended to balance[] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Hupp*, 931 F.3d at 317 (quoting *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015)) (other citation and internal quotations omitted). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (other citations and internal quotations omitted).

"An official is not entitled to qualified immunity if he or she deprived an individual of a constitutional right and that right was clearly established at the time of the violation." *Hupp*, 931 F.3d at 317 (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Therefore, the Court's analysis is two-fold: (1) the "[C]ourt must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right[,]" and (2) "the [C]ourt must decide whether the right at issue was clearly established at the time of defendant's alleged misconduct."[4] *Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation and internal quotations

---

[4] This Court recognizes that "[b]ecause the two-step *Saucier* procedure is often, but not always, advantageous, the judges of the district courts . . . are in the best position to determine the order of decision-making that will best facilitate the fair and efficient disposition of each case." *Pearson*, 555 U.S. at 242.

omitted). Although a case directly on point is not required "for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citation and internal quotations omitted). The qualified immunity analysis will be incorporated into each federal count as a defense.

### III.   ANALYSIS

To establish a violation under Section 1983, Plaintiffs must prove that Defendants acted under the color of state law and, in doing so, deprived them of their constitutional rights. *West v. Atkins*, 487 U.S. 42, 48 (1988).

### A.   Federal Claims—Counts I, II, & III

#### 1.   False Arrest and False Imprisonment Under the 4th Amendment (Count III)

"In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause." *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir. 199). "[F]alse arrest and false imprisonment claims . . . are essentially claims alleging a seizure of the person in violation of the Fourth Amendment . . . ." *Rogers v. Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001). To justify Officer Becketts' entry into Plaintiffs' home and the seizure of both Plaintiffs therein and outside, Defendants rely on a fallacy concerning the effectuation of a *Terry* stop within a home. Specifically, Defendants argue that there existed reasonable suspicion that a burglary was in progress and that such reasonable suspicion permitted Defendants to "enter the residence and use minimal force to move Plaintiffs outside for further investigation." (ECF No. 40-1 at p. 8). Such an assertion cannot withstand Constitutional scrutiny.

At the "very core [of the Fourth Amendment] stands the 'right of a man to retreat into his own home and there be free from unreasonable government intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013). "The zealous and frequent repetition of the adage that 'a man's house is his

castle,' made it abundantly clear that both in England and in the Colonies 'the freedom of one's house' was one of the most vital elements of English liberty." *Payton v. New York*, 445 U.S. 573, 596–97 (1980). With the sacrosanct status of the home in mind, the United States Supreme Court has opined that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id.* at 586 (quoting *United States vs. U.S. Dist. Ct. for E.D. Mich., S. Div.*, 407 U.S. 297, 313 (1972)). As such, "[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth amendment has drawn a firm line at the entrance to the house." *Payton*, 445 U.S. 573. The establishment of this firm line naturally leads to the conclusion that a "basic principle of Fourth Amendment law [is] that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586. As a result of this presumptive unreasonableness, a "warrantless arrest in a home violates the Fourth Amendment unless the arresting officer had probable cause to make the arrest *and* either consent to enter or exigent circumstances demanding that the officer enter the home without a warrant." *Moore v. Pederson*, 806 F.3d 1036, 1043 (11th Cir. 2015) (other citation omitted) (emphasis in original); *see also U.S. v. Brown*, 449 F.3d 741, 745 (6th Cir. 2006) ("To justify a warrantless entry based on exigent circumstances, there must also be probable cause to enter the residence.") (citing *United States v. Johnson*, 9 F.3d 506, 509 (6th Cir. 1993)); *Larson v. Dupnik*, 14-1592 TUC DCB, 2015 WL 5287040, at *5 (D. Ariz. Sept. 9, 2015) ("[T]he exigency exception . . . allows [officers] to enter a home without a warrant if they have *both* probable cause to believe that a crime has been or is being committed . . ." and a reasonable belief that an exigency exists) (other citation and internal quotations omitted) (emphasis added). Without a warrant or warrant exception to enter a home,

"any physical invasion of the structure of the home, by even a fraction of an inch, [is] too much . . . ."[5] *See Kyllo v. U.S.*, 533 U.S. 27, 37 (2001) (other citation and internal quotations omitted).

Here, Defendants do not argue that there was probable cause regarding their initial seizure of Plaintiffs and subsequent removal of Plaintiffs from the home.  Instead, Defendants attempt to contort the concept of a *Terry* stop into an all-powerful warrant exception permitting officers to enter a home and remove a family therein on nothing more than reasonable suspicion that a burglary might possibly be occurring. (ECF No. 40-1 at pp. 9–19). Plaintiffs argue against this by asserting that the concept of a *Terry* stop is inapplicable in the context of this case. (ECF No. 49 at pp. 24–28). Defendants first assert that a *Terry* stop may be conducted within a home by citing to this Court's opinion in *United States v. Dupree*, RDB-13-00256, 2013 WL 4499037 (D. Md. Aug. 20, 2013). Defendants contend that in *Dupree*, this Court held reasonable suspicion sufficient to enter a residence for the purpose of effecting a *Terry* stop. (ECF No. 40-1 at p. 13). However, this Court provided no such holding. In *Dupree*, a City Watch Camera Operator ("operator") in Baltimore City was monitoring a specific location because a shooting had occurred there the previous day. *Dupree*, 2013 WL 4499037, at *1. The operator observed a man standing on the porch of a house and performing actions indicative of concealing a weapon. *Id.* The operator then informed officers in the area about the man and his suspicious behavior. *Id.* The officers then traveled to the house to investigate the situation. *Id.* at *2. Upon the officers' approach, one man calmly walked into the house, and another man quickly walked up the steps of the porch and into the house. *Id.* The entry of the two men into the house was followed by an officer running up the stairs to the porch, opening the door to the house, and entering it. *Id.* The government argued that

[5] The Court is cognizant of the United States Supreme Court's recognition that "police may enter a home without a warrant where they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Smith v. Kenny*, 6789 F. Supp. 2d 1124, 1159 (D.N.M. 2009). However, Defendants argue no such belief existed, and the facts do not indicate otherwise.

"courts have recognized that a person cannot avoid a *Terry* stop simply by retreating into a home." *Rivera v. Washington*, 57 F. App'x 558, 562 (4th Cir. 2003). However, this Court recognized that the cases establishing the impermissibility of retreat into the home to defeat a *Terry* stop involved facts where officers had reasonable suspicion to stop suspects *before* they retreated into a house. *Dupree*, 2013 WL 4499037, at *5. Based on that distinction, this Court held:

> The government did not submit adequate proof that there was hot pursuit of a felon . . . imminent destruction of evidence, . . . the need to prevent a suspect's escape, . . . the risk of danger to the police or to other persons inside or outside the dwelling.

*Id.* at *6 (citation and internal quotations omitted). Nothing in *Dupree* indicates that officers, having not first encountered the suspects outside of a home, can enter a home based upon nothing but reasonable suspicion and supposed exigent circumstances.

To buttress their claim that reasonable suspicion permitted the entry into Plaintiffs' townhouse and the arrest of Plaintiffs, Defendants cite to multiple cases that this Court will easily distinguish from Plaintiffs' case. Defendants first cite to *Arvizu*, but that case involved an officer stopping a minivan on a public road. *United States v. Arvizu*, 534 U.S. 266, 271–72 (2002). Defendants' reliance on *Coleman* is misguided because that case involved a school safety officer stopping a suspicious vehicle in the school's parking lot. *United States v. Coleman*, 18 F.4th 131, 133–34 (4th Cir. 2021). In *Johnson*, a stop was performed on a prostitute's guard outside of an apartment. *United States v. Johnson*, 713 F. App'x 232, 232–33 (4th Cir. 2018). In *Crittendon*, the officers initiated a stop on the landing of an apartment building's stairwell. *United States v. Crittendon*, 883 F.2d 326, 327–28 (4th Cir. 1989). Although citing several other cases, Defendants

were unable to provide this Court with a single case standing for the proposition that reasonable suspicion alone provides officers with the ability to enter a home.[6]

*Griffith-Guerrero* is a case with facts strikingly similar to the facts now before this Court. In *Griffith-Guerrero*, officers received a call from the plaintiff's neighbor reporting a suspicious vehicle parked in the vicinity of both the caller's home and the plaintiff's home. *Griffith-Guerrero v. Spokane Cnty.*, 15-cv-0342-TOR, 2017 WL 2786472, at *1 (E.D. Wash. June 27, 2017). Before arriving at the location, the two dispatched officers were informed that the vehicle had already left the location. *Id.* The officers could not locate the address given by the caller, so the officers assumed the correct address was that of the plaintiff's house based upon tire tracks in the snow of the lower driveway. *Id.* Suspecting a potential burglary, the officers, with guns drawn, decided to split up and approach the plaintiff's home from separate directions. *Id.* at *2. One officer proceeded to the back of the home, discovered that the back door was unlocked, and shined his flashlight along the windows and doors. *Id.* The other officer proceeded to the front of the home and shined his flashlight through the front door. *Id.* Noticing the flashlights shining into his home, the plaintiff attempted to scare the then-unknown officers away by slapping the front door from the inside of the home. *Id.* The plaintiff then proceeded to crack open the front door to look outside, and upon seeing a gun, the plaintiff abruptly shut the door. *Id.* The officer at the front door then yelled for the plaintiff to open the door and indicated that he was in fact an officer. *Id.* The plaintiff was then ordered out of the home, and the officer from the back of the home proceeded to the front. *Id.* The

---

[6] Defendants also assert that exigent circumstances existed permitting the entry into Plaintiffs' home. However, as already stated, this Court recognizes that exigent circumstances *and* probable cause are required for the police to enter a home under the circumstances of this case. Defendants do not once argue the existence of probable cause that a burglary was in progress. As such, the Court need not consider whether an exigency existed, especially since the exigency alleged by Defendants is nothing more than the existence of a suspected burglary. *See Carroll v. State*, 335 Md. 723, 734 (1994) ("We hold that when . . . officers have probable cause to believe that a burglary is . . . in progress[,] . . . the exigencies of the situation permit the officers to enter the premises without a warrant to search for intruders and to protect an occupant's property."). A presumption of exigent circumstances arises in the presence of probable cause that a burglary is in progress, not reasonable suspicion.

plaintiff informed the officers that he owned the home, but the officers still instructed him to kneel in the yard and handcuffed him. *Id.* at *3. The officers confirmed that the home belonged to the plaintiff by checking his wallet and speaking with the neighbor. *Id.* After this confirmation, the officers finally released the plaintiff. *Id.*

Similar to Defendants here, the officers in *Griffith-Guerrero* justified their seizure of the plaintiff based upon reasonable suspicion that a burglary was in progress. *Id.* at *6. However, the United States District Court for the Eastern District of Washington recognized that "the *Terry* exception to the warrant requirement does not apply to in-home searches and seizures." *Id.* (citation omitted). The Court held that "[o]rdering [the] [p]laintiff out of his home is a categorical violation of his Fourth Amendment rights—whether it is called a temporary detention or arrest, it was a seizure." *Id.* at *7.

Here, Plaintiffs were exposed to far more than one officer's command, given at gunpoint, to exit their home. The undisputed facts indicate that Officer Becketts entered Plaintiffs' home with his gun pointed directly at Plaintiffs. Officer Becketts immediately began yelling for Plaintiff's to "get the fuck on the ground." Officer White, with his gun drawn, stood almost immediately behind Officer Becketts and also commanded Plaintiffs to get on the ground. Officer Becketts proceeded to grab both Plaintiffs by their wrist and direct them outside of their home. All the while, four other officers remained outside the home, at least one other with his weapon drawn, and stood prepared to assist in the further seizure of Plaintiffs. Just like the court determined in *Griffith-Guerrero*, regardless of whether the officers were effectuating a temporary detention or

an arrest, Plaintiffs were subjected to an unlawful seizure.[7] The only Defendant who did not participate in the seizure that took place at Plaintiffs' townhome was Officer Pearson, whose only role in the entirety of the events that transpired was processing Mr. Allotey upon his arrival at the Woodlawn Precinct.

There is no doubt that Defendants, other than Officer Pearson, violated Plaintiffs' constitutional right to be free from unreasonable seizure by ordering or assisting in ordering Plaintiffs, at gun point, to exit their home based merely on reasonable suspicion. Furthermore, it is "clearly established that warrantless entry into a home without an exception to the warrant requirement violate[s] clearly established law." *Williams v. Maurer*, 9 F.4th 416, 440 (6th Cir. 2021) (other citation omitted); *see also Beatty v. Township of Elk*, 08-2235 RBK/JS, 2010 WL 1493107, at *5 (D.N.J. Apr. 14, 2010) ("the [c]ourt is compelled to find that the right to be free from a warrantless search or seizure in one's home absent an exigency was clearly established as of October 31, 2006.") (citing *Payton*, 445 U.S. at 573).

Attempting to delineate between what they believe was an initial valid *Terry* stop and the subsequent arrest of Mr. Allotey, Defendants argue that there existed probable cause to arrest Mr. Allotey for resisting arrest, assaulting Officer Becketts in the second degree, and obstructing and hindering. (ECF No. 40-1 at pp. 20–22). Defendants assert that even if their initial *Terry* stop was unlawful, Mr. Allotey had no right to resist such a stop and Mr. Allotey was not permitted to touch Officer Becketts. *Id.* at p. 20. However, this Court is convinced that the initial seizure of Plaintiffs in their townhouse surpassed an illegal *Terry* stop and amounted to an arrest. "A show of force is

---

[7] "Factors that might indicate a seizure include a threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be compelled, approaching the citizen in a nonpublic place, and blocking the citizen's path." *Swift v. State*, 393 Md. 139, 150 (2006) (other citations omitted). Nearly every one of these factors are present here, and Defendants even admit that Plaintiffs were at least "detained . . . for investigative purposes . . . ." (ECF No. 40-1 at p. 32).

objective conduct demonstrating the officer's intent to make an arrest." *Bailey v. State*, 412 Md. 349, 371 (2010). "[G]enerally, a display of force by a police officer, such as putting a person in handcuffs, is considered an arrest." *Id.* (other citation omitted). "If a seizure and subsequent search is not justified by reasonable, articulable suspicion that the individual is armed pursuant to *Terry*, the seizure is a de facto arrest and must be supported by probable cause to be lawful." *Id.* at 372–73. Here, the Court has already determined that the seizure of Plaintiffs cannot be supported based merely on reasonable articulable suspicion as Defendants suggest. Therefore, when Plaintiffs opened the door of their home at the command of a gun-wielding officer, were ordered on the ground, and were forced outside their house, they were effectively arrested by the officers, and this arrest occurred without the requisite probable cause and exigency.[8]

Therefore, the Court GRANTS summary judgment on Count III as to Officer Pearson, but the Court DENIES summary judgment on Count III as to the remaining officers. As there exists no material facts in dispute and Plaintiffs are entitled to judgment as a matter of law, this Court GRANTS summary judgment as to Count III for Plaintiffs against all individual Defendants except Officer Pearson.

### 2.   Excessive Force Under the Fourth and Fourteenth Amendments (Count I)

"As in other Fourth Amendment contexts, . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Fourth Amendment jurisprudence has "long recognized that the right to make an arrest or investigatory

---

[8] Having concluded that there was but one arrest that occurred throughout the incident, the Court need not address Mr. Allotey's assertion in Counts III and VII that he was further subjected to false arrest and false imprisonment. (ECF No. 14).

stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396 (citation omitted). In applying the reasonableness standard to excessive force cases, courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation omitted). Importantly, "if Defendant[s] had no right to be inside the home, then [they] had no right to use force." *Williams*, 9 F.4th at 440. Rather than focusing on any injury Plaintiffs may have suffered, the Court should focus on "whether 'gratuitous violence' has been inflicted." *Id.* at 439. In sum, in determining whether the force used against Plaintiffs was excessive and thus unreasonable under the Fourth Amendment, the Court "balance[s] the nature and quality of the intrusion of the individual's Fourth Amendment interests against the countervailing government interest at stake." *Graham*, 490 U.S. at 396.

*Williams v. Mauer*, yet another case with facts similar to those before the Court, provides great insight into analyzing excessive force. *See Williams*, 9 F.4th 416. In *Williams*, an anonymous person called 911 and reported that "someone had just busted into [her] neighbors." *Id.* at 423. The caller also reported that she "heard him down there screaming" and she "heard some . . . glass breaking." *Id.* Police dispatch then sent officers to the scene briefed on the information the caller provided. *Id.* The officers heard yelling but were unable to ascertain from which apartment it was coming. *Id.* Furthermore, the officers noticed that the outside pane of a double-paned window leading into the apartment the caller identified was broken. *Id.* After repeatedly knocking on the door of the suspected apartment, the female resident partially opened the door. *Id.* After a brief conversation with the officers, the plaintiff attempted to close the door. *Id.* Without observing any further signs of suspicious activity, the officers pushed their way into the apartment. *Id.* at 424. Recognizing that the plaintiff was trying to close the door, as was permitted by her Fourth

Amendment right to be free from unreasonable search and seizure, the court found that the officers pushing open the door was an action permitting a reasonable juror to find that the plaintiff was exposed to excessive force. *Id.* at 439.

Here, there is ample evidence that would permit a reasonable juror to determine that the officers used excessive force in effectuating the arrest of Plaintiffs. Regarding the first factor, the arrest initiated without Plaintiffs having committed any crime. Even if the Court distinguishes between the clearly unlawful arrest of Plaintiffs that occurred as soon as Plaintiffs opened the door and the allegedly distinct arrest that occurred after Mr. Allotey allegedly touched Officer Becketts, the Court is convinced that sufficient evidence exists that would permit a reasonable juror to find excessive force was used after Mr. Allotey allegedly grabbed Officer Becketts. Secondly, Officer Becketts admits that he saw nothing in the possession of Plaintiffs (i.e., a weapon or burglar tools) that would indicate a threat to the officers. As indicated in the body camera footage, at least one hand of both Plaintiffs was in plain view and empty when they opened the door. Defendants admit that Mr. Allotey, other than allegedly grabbing Officer Becketts wrist, never attempted to strike or swing at any officers. Some Defendants even admit that they never saw Mr. Allotey commit a crime for which he should be arrested, nor did they see Mr. Allotey do anything to warrant being struck in the face or maced. Therefore, a reasonable juror could find that it would be unreasonable for Defendants to believe Mr. Allotey posed a threat to the officers. Lastly, the Court finds that there is ample evidence to permit a reasonable juror to find that Mr. Allotey was not attempting to actively resist arrest or escape. Officer Becketts pepper sprayed Mr. Allotey within ten seconds of the first request for Mr. Allotey to place his arms behind his back. Additionally, some Defendants admit that Mr. Allotey was just shifting his weight and tensing. Some Defendants further admit that Mr. Allotey's reaction was natural for someone who had just been pepper sprayed in the face

or grabbed from behind. Furthermore, the evidence indicates that at least four officers were on top of Mr. Allotey at one point in time, providing a reasonable juror enough evidence to conclude that all Defendants, except for Officer Pearson, were physically involved in the arrest of Mr. Allotey and potentially used excessive force upon him.

The Court's conclusion that a reasonable juror could find that Plaintiffs were subjected to excessive force is further supported by the court's granting of summary judgment in favor of the plaintiff in *Griffith-Guerrero*. In that case, after finding that the officers' conduct—similar to the Defendants' conduct in the case *sub judice*—was a categorical violation of the plaintiff's Fourth Amendment rights, the court went on to grant summary judgment in favor of the plaintiff regarding the excessive force claim. "Pointing guns at [p]laintiff, ordering him out of his home at night, and onto his knees in his own front yard to handcuff him was objectively unreasonable under the circumstances." *Griffith-Guerrero*, 2017 WL 2786472, at *7.

Defendants can seek no shelter under qualified immunity for this claim. As has already been found, "it is clearly established that warrantless entry into a home without an exception to the warrant requirement violate[s] clearly established law." *Williams*, 9 F.4th at 440 (other citations omitted). Furthermore, "it is clearly established that "[g]ratuitous violence is never reasonable because there is simply no governmental interest justifying gratuitous violence." *Id.* (citing *Graham*, 490 U.S. at 395 (explaining that the use of unreasonable force while effecting the "'seizure' of a free citizen" violates the Fourth Amendment).

The Court recognizes that whether excessive force was used "is inherently fact specific, [and] the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Quintero v. City of Escondido*, 2017 WL 4005345, at *11 (S.D. Cal. Sept. 11, 2017). There is sufficient evidence that would permit a

reasonable juror to determine that Plaintiffs were subjected to excessive force in violation of the Fourth Amendment. Therefore, the Court will GRANT summary judgment in favor of Officer Pearson and DENY summary judgment as to the remaining individual Defendants.

### 3. Malicious Prosecution Under the Fourth and Fourteenth Amendments (Count II)

To prove a claim of malicious prosecution under Section 1983, a plaintiff must show "that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Hupp v. Cook*, 931 F.3d 307, 324 (4th Cir. 2019). Defendants' sole argument in favor of summary judgment for this count focuses on the existence of probable cause to arrest Mr. Allotey. (ECF No. 40-1 at p. 29). However, there are material facts in dispute regarding whether probable cause existed to arrest Mr. Allotey for the charges brought against him.

Under Maryland law, probable cause is defined as:

[A] reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing that the accused is guilty. . . . Mere belief, however sincere, is not sufficient. There must be such grounds of belief founded upon actual knowledge of facts as would influence the mind of a reasonable person.

*Nasim v. Tandy Corp.*, 726 F. Supp. 1021, 1026 (D. Md. 1989) (quoting *Banks v. Montgomery Ward & Co.*, 212 Md. 31, 39 (1956)) (other citations omitted). "If the facts relied upon or the inferences from them are 'clear and undisputed,' the question of probable cause is one of law for the court. *Nasim*, 726 F. Supp. at 1026 (citing *Gladding Chevrolet v. Fowler*, 264 Md. 499, 506 (1971) (quoting *Kennedy v. Crouch*, 191 Md. 580, 590–91, (1948)). However, [w]here the facts are contested, the absence of probable cause is a jury question." *Nasim*, 726 F. Supp. at 1026.

Defendants claim that the arrest of, and subsequent charges against, Mr. Allotey were the direct result of Mr. Allotey grabbing the hand of Officer Becketts. According to Defendants, Mr.

Allotey grabbed Officer Becketts by the hand and then resisted the subsequent arrest. However, Mr. Allotey does not admit to grabbing Officer Becketts hand at any point. Furthermore, there is no evidence indicating that the other officers at the scene saw Mr. Allotey grab Officer Becketts' hand. After reviewing the body camera footage provided with Defendants' Motion, although the Court could clearly see Officer Allotey grab both Plaintiffs, this Court could not see whether Mr. Allotey ever placed his hands on Officer Becketts. The dispute of this material fact is further supported by Officer Zaloudek-Hensley's admission that she had not observed Mr. Allotey commit any crime at the point in which Officer Becketts first struck Mr. Allotey. Officer Zaloudek-Hensley was standing directly next to Officer Becketts and Mr. Allotey when the alleged grabbing occurred, so her inability to recall Mr. Allotey grabbing Officer Becketts clearly indicates that a question of fact exists for a jury to determine. Additionally, several Defendants admit that Mr. Allotey behaved in a manner throughout the incident in a way that is natural for someone who has been grabbed from behind or pepper sprayed in the face, i.e., Mr. Allotey tensed up and attempted to wipe the pepper spray out of his eyes. The Court also notes that Mr. Allotey was wearing a leather jacket at the time of the arrest. As Mr. Allotey is walking in handcuffs towards the police cruiser for transport, the jacket is clearly slumped off of Mr. Allotey's shoulders. A jury could determine that the initial attempt of the Defendants to place Mr. Allotey in handcuffs was thwarted by an inability of a larger man such as Mr. Allotey to put his arms behind his back while wearing a potentially restrictive jacket.[9] Defendants also acknowledge that Mr. Allotey, rather than striking at Defendants, was shifting his weight and tensing his body. With these facts in dispute, it is up to a

---

[9] Defendants argue in their Motion that Mr. Allotey's "large size," amongst other factors, gave Defendants concern that Mr. Allotey "might be dangerous[.]" (ECF No. 40-1 at p. 24).

jury to determine whether probable cause existed to arrest Mr. Allotey for any of the crimes for which he was charged after he was unlawfully pulled from his home.

Lending further support to the conclusion that a jury must determine whether probable cause existed to arrest and charge Mr. Allotey with the three aforementioned crimes is Maryland's common law right to resist an unlawful arrest. The Court of Appeals of Maryland has recognized the "long-standing common law rule that 'one illegally arrested may use any reasonable means to effect his escape, even to the extent of using such force as is reasonably necessary.'"[10] *State v. Wiegmann*, 350 Md. 585, 601 (1998) (other citations omitted). Due to the disputed facts, it will be the role of the jury to determine whether probable cause existed for the officers to arrest Mr. Allotey for the crimes with which he was charged. *See Arthur v. State*, 420 Md. 512, 528 (2011) ("Our next step is to evaluate whether the pattern jury instruction fairly covered the issue of whether [the officer] had probable cause to arrest [the defendant]."). Assuming no probable cause existed, the jury will then have to determine whether Mr. Allotey's grabbing of Officer Becketts, if it occurred, was a reasonable means of resisting an unlawful arrest.

Regarding qualified immunity, restating what has already been made clear, "the Fourth Amendment right to be free of arrest without probable cause is a clearly established constitutional right." *Henderson v. Simms*, 223 F.3d 267, 273 (4th Cir. 2000). At this time, the Court cannot determine that Defendants had qualified immunity regarding the federal malicious prosecution claim. *See e.g.*, *Savage v. Mayor and City Council of Salisbury*, CCB-08-3200, 2010 WL 3038953, at *6 (D. Md. July 30, 2010) (refusing to grant qualified immunity at the summary judgment stage

---

[10] Although Defendants are correct in their assertion that a person has no right to resist an illegal *Terry* stop, this Court has already dispelled the idea that a *Terry* stop could have been performed in this situation. *Barnhard v. State*, 86 Md. App. 518, 528 (1991), *aff'd*, 325 Md. 602 (1992) ("[W]e conclude that there is no right to resist an 'illegal' stop.").

because the officers bore the burden of establishing qualified immunity and had not established the existence of probable cause permitting the arrest of plaintiff).

Plaintiffs have provided no evidence indicating that Officer Pearson "caused" the arrest of Plaintiffs, so summary judgment is GRANTED in favor of Officer Pearson as to Count II. However, summary judgment is DENIED as to all other individual Defendants as to Count II .

### B.  Maryland Declaration of Rights Claims—Counts V, VI, & VII

"Articles 24 and 26 are read *in pari materia* with the Fourteenth and Fourth Amendments to the United States Constitution, respectively." *Warren v. Montgomery Cnty.* PJM 09-2510, 2012 WL 3779165, at *5 (D. Md. Aug. 30, 2012).[11] Therefore, in accordance with the Court's analysis under Section 1983: (1) summary judgment is GRANTED as to Count VII in favor of Officer Pearson and in favor of Plaintiffs against all other individual Defendants, and (2) summary judgment is GRANTED as to Counts V and VI in favor of Officer Pearson and DENIED as to all other individual Defendants.

### C.  Maryland Common Law Claims—Counts IX, X, XI, XII, and XIII

Like the defendants in *Griffith-Guerrero*, Defendants here seek summary judgment on all common law claims brought by Plaintiffs. *See Griffith-Guerrero*, 2017 WL 2786472, at *8. Defendants' arguments primarily rely on the assumption that their actions against Plaintiffs were

---

[11] Defendants mistakenly claim that Plaintiffs have brought their federal excessive force claim under only the Fourteenth Amendment. However, the claim was clearly brought under both the Fourth and Fourteenth Amendments. (ECF No. 14 at p. 11). For clarification purposes, "Article 24 of the Maryland Constitution is not the proper vehicle under which to bring an excessive force claim arising out of an arrest." *Barnes v. Montgomery Cnty, Md.*, 798 F. Supp. 2d at 700. "It has been clearly established that Article 24 protects the same rights as the Fourteenth Amendment, and Article 26 protects the same rights as those protected under the Fourth Amendment." *Id.* (other citation omitted). Plaintiffs evidently exercised caution by bringing their excessive force claims under all potentially applicable portions of the Constitution and the Maryland Declaration of Rights. Plaintiffs' excessive force claims arise out of their arrests, therefore, summary judgment will be GRANTED in favor of all individual Defendants as to Counts I and V to the extent that those claims are brought under the Fourteenth Amendment and Article 24. *See Winston v. Haziminas*, No. GJH-19-0026, 2022 WL 1997206, at *5 (D. Md. June 6, 2022) (finding that allegations regarding excessive force arising out of an arrest "clearly invoke the fourth Amendment, not the Fourteenth Amendment.").

lawful and privileged. *See id.* At the outset, the Court recognizes that Maryland common law [f]alse imprisonment, false arrest, and . . . battery (when the force used is not excessive) can only occur when there is no legal authority or justification for the arresting officer's actions." *Williams v. Prince George's Cnty.*, 112 Md. App. 526, 554 (1996) (other citation omitted).

### 1.  Maryland Common Law Battery (Count IX)

Under Maryland's common law, a battery is the "unpermitted application of trauma by one person upon the body of another person." *McQuiggan v. Boy Scouts of Am.*, 73 Md. App. 705, 714 (1988). "[T]he tort of battery requires *intent* by the actor 'to bring about a harmful or offensive contact. . . . [It is] confined to intentional invasions of their interests in freedom from harmful or offensive contact.'" *Janelsins v. Button*, 102 Md. App. 30, 35 (1994) (other citation omitted) (emphasis added by *Janelsins*). The Court of Special Appeals of Maryland has recognized the privilege officers have to use reasonable force in effectuating a lawful arrest:

> The use of reasonable force to effectuate an arrest defeats a battery or an assault claim. In other words, contact incident to an arrest cannot form the basis of a claim for battery. Indeed, officers are privileged to commit a battery pursuant to a lawful arrest, *subject to the excessive force limitation* . . . . If an officer uses excessive force, or force greater than is reasonably necessary under the circumstances, the officer may be liable. In other words, an officer's nonprivileged use of force constitutes battery.

*French v. Hines*, 182 Md. App. 201, 265–66 (2008) (quoting *Sonja Larsen & Thomas Muskus,* 6A C.J.S. *Assault* § 35 (2008 Supp.)) (emphasis added by *French*). "The standard for determining excessive force is the same whether the action is brought as constitutional claims or as claims of common law battery and gross negligence." *Estate of Hammond v. Cox*, No. 07-C-14-002008, 2020 WL 5700718, at *3 n.9 (Md. Ct. Spec. App. Sept. 24, 2020) (citing *Richardson v. McGriff*, 361 Md. 437, 452–53 (2000); *see also Griffith-Guerrero*, 2017 WL 2786472, at *8 ("the standards for adjudicating Section 1983 claims grounded on constitutionally prohibited excessive force are

the same standards that apply to both state law assault and battery claims."); *Griffin v. Hardrick*, 604 F.3d 949, 956 (6th Cir. 2010) ("Where a plaintiff asserts a battery claim under [state] law that arises out of the same use of force has her § 1983 excessive-force claim, the analysis is the same for both causes of action.").

Here, the Court has already determined that there is sufficient evidence that would permit a reasonable juror to find that Defendants inflicted excessive force upon Plaintiffs. Furthermore, the Court has already determined that the officers had no legal justification to arrest Plaintiffs when Plaintiffs first opened the door. As Plaintiffs have asserted, there exists a factual dispute for the jury to decide regarding which officers physically touched Mr. Allotey. Therefore, Defendants' motion for summary judgment as to Count IX is GRANTED in favor of Officer Pearson and DENIED as to all other individual Defendants.

### 2. Maryland Common Law False Arrest and False Imprisonment (Count X)

Under Maryland law, "the elements of false arrest and false imprisonment are identical: 1) the deprivation of the liberty of another; 2) without consent; and 3) without legal justification." *Gray v. Maryland*, 228 F. Supp. 2d 628, 641 (2002) (other citation omitted). As previously stated, false arrest and false imprisonment can occur only when there is no legal justification for the officers' actions. *Williams*, 112 Md. at 554. As the Court has already determined that the officers were not legally justified in arresting Plaintiffs at the very beginning of this incident, summary judgment as to count X is DENIED as to all individual Defendants except Officer Pearson. *See Griffith-Guerrero*, 2017 WL 2786472, at *9 (The court found no probable cause to arrest plaintiff, therefore the court denied the defendant's motion for summary judgment for false arrest or false imprisonment).

### 3.   Maryland Common Law Malicious Prosecution (Count XI)

The Maryland common law tort of malicious prosecution consists of four elements: "1) a criminal proceeding instituted or continued by the defendant against the plaintiff; 2) without probable cause; 3) with malice, or with a motive other than to bring the offender to justice; and 4) termination of the proceeding in favor of the plaintiff." *Barnes*, 798 F. Supp. 2d at 698 (other citation omitted). "Malice is established by evidence which shows that a party acted for an improper motive." *Glover v. Fleming*, 36 Md. App. 381, 384 (1977). "A party who acts from a motive other than that of bringing an offender to justice acts from an improper motive." *Id.* In cases involving a lack of probable cause to arrest the plaintiff for the charges brought, "[m]alice may . . . be inferred from a lack of probable cause." *Id.* In their efforts to negate such an inference, defendants can provide evidence "that the party did not act out of ill will, spite, hatred or reckless conduct." *Id.*

Here, there is a genuine dispute of material fact regarding whether probable cause existed to charge Mr. Allotey with any of the charges brought against him. Furthermore, Defendants have not provided the Court with evidence sufficient to negate the inference of malice to which Mr. Allotey may or may not be entitled. To the contrary, at least as it pertains to Officer Becketts, Plaintiffs have pointed the Court to evidence from which a reasonable juror might conclude that Officer Becketts did perhaps act with the requisite malice: 1) Officer Becketts agreed that it was possible that he had a conversation with another officer regarding his motive in charging Mr. Allotey in an effort to justify the force used and avoid discipline, and 2) Officer Becketts admitted that he considers whether he used force before deciding whether to charge someone.

Defendants' Motion is DENIED as to Count XI.

### 4.   Maryland Common Law Gross Negligence (Count XII)

In Maryland, "[g]ross negligence is 'an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them.'" *Bailey v. City of Annapolis*, 252 Md. App. 83, 98 (2021) (quoting *Howard v. Crumlin*, 239 Md. App. 515, 529 (2018)). "A party 'is guilty of gross negligence or acts wantonly and willfully only when he [or she] inflicts injury intentionally or is so utterly indifferent to the rights of others that he [or she] acts as if such rights did not exist.'" *Bailey*, 252 Md. App. at 98 (quoting *Howard*, 239 Md. App. at 529). "Whether or not gross negligence exists necessarily depends on the facts and circumstances in each case. . . . It is usually a question for the jury and is a question of law only when reasonable men could not differ as to the rational conclusion to be reached." *Romanesk v. Rose*, 248 Md. 420, 423 (1968) (other citation omitted).

Defendants' sole argument in favor of summary judgment on this claim rests on their assertion that the arrest of Plaintiffs was lawful. However, the Court has already recognized that the arrest that transpired at the initiation of this incident was not lawful, and it is disputed whether probable cause existed for any arrest based upon the subsequent charges brought against Mr. Allotey. A reasonable juror could find that the Defendants acted in reckless disregard of Plaintiffs' constitutional rights. However, there are no facts upon which a jury could find that Officer Pearson acted with gross negligence; Officer Pearson's involvement in this case comes solely in the form of him assisting in booking Mr. Allotey.

As to Count XII, the Court will GRANT Defendants' Motion as to Officer Pearson, but it will DENY the MOTION as to all other individual Defendants.

28

**5.   Maryland Common Law Negligence (Count XIII)**

In Maryland, "[q]ualified  public official immunity is a defense to negligence actions."

*Williams,* 112 Md. App. at 549 (other citations omitted). In *Williams*, the Court of Special Appeals

of Maryland recognized that:

> Section 5-321(b)(1) of MD. CODE ANN., CTS. & JUD. PROC. provides that an
> official of a municipal corporation while acting in a discretionary capacity, without
> malice, and within the scope of the official's employment or authority shall be
> immune as an official or individual from any civil liability for the performance of
> the action.

*Id.* "Unquestionably, the actions of police officers within the scope of their law enforcement

function are quintessential discretionary acts." *Id.* (other citations omitted). The Maryland doctrine

of qualified public official immunity is narrow in scope, and the courts have consistently held that

the doctrine "has no application in tort actions based upon alleged violations of state constitutional

rights or tort actions based upon most so-called 'intentional torts.'" *Lee v. Cline*, 384 Md. 245, 258

(2004). Further narrowing the applicability of the doctrine, "in order to prevail under either a

statutory or common law immunity defense, the official must be acting in a discretionary capacity

and not be grossly negligent or act with malice." *Bailey*, 252 Md. App. 83 (citing *Lee*, 384 Md. at

258).

As previously stated, a reasonable juror could find that all Defendants other than Officer

Pearson acted with gross negligence by recklessly disregarding the constitutional rights, both State

and Federal, of Plaintiffs. Therefore, the Court cannot conclude that Defendants are entitled to

Maryland's common law or statutory qualified immunity.

As to Count XIII, the Court will GRANT Defendants' Motion in favor of Officer Pearson,

but the Court will DENY the Motion as to the remaining individual Defendants.

## IV.    Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part, and partial summary judgment is GRANTED in favor of Plaintiffs as to Counts III and VII. A separate order follows.


Date: <u>November 22, 2022</u>                                    <u>                    /s/                    </u>

                                                                J. Mark Coulson
                                                                United States Magistrate Judge